# United States Court of Appeals

### for the

# District of Columbia Circuit

No. 24-3131 (consolidated with No. 23-3142)

UNITED STATES.,

*Appellee,*

v.

TERENCE SUTTON.

*Defendant-Appellant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

**BRIEF OF DEFENDANT TERENCE SUTTON**

J. MICHAEL HANNON
HANNON LAW PLLC
2101 L STREET, NW SUITE 300
WASHINGTON, DC 20037
TEL: (202) 232-1907

CARMEN D. HERNANDEZ
7166 MINK HOLLOW RD
HIGHLAND, MD  20777
(240) 472-3391

KELLEN S. DWYER
ALSTON & BIRD LLP
950 F STREET, NW
WASHINGTON, DC 20004-1404
(202) 239-3300

## <u>Statement Accepting Presidential Pardon</u>

On January 22, 2025, President Trump issued Officer Sutton a "full and unconditional pardon" for his convictions in this case. Officer Sutton **fully accepts** that pardon. On January 23, 2025, the government moved to vacate Sutton's convictions and remand for dismissal. Officer Sutton **consented** to that motion and continues to **urge the Court to grant it swiftly**. Officer Sutton files this brief simply to comply with the briefing schedule the Court issued on November 19, 2024, as amended on January 16, 2025, and to provide an alternative basis to reverse or vacate his convictions in the event that the government's pending motion to vacate is denied for any reason.

<u>**Certificate as to Parties, Rulings, and Related Cases**</u>

**A. Parties and Amici**

Officer Terence Sutton is the Appellant in this case and was a defendant in the district court. Sutton's co-defendant in the district court, Lieutenant Andrew Zabavsky, has appealed his conviction in case number 24-3142.

The National Fraternal Order of Police filed an amicus brief in the district court in support of Officer Sutton's motions for judgment of acquittal and new trial. *See* Dkt. 481. There are currently no amici appearing before this Court.

**B. Rulings Under Review**

Officer Sutton appealed the judgment in this case, Dkt. 677-78, which encompasses his conviction, sentence, and all pre-trial, trial, and post-trial rulings encompassed within the judgment, including the following. All rulings were by the Hon. Paul L. Friedman (D.D.C.).

- Oral Decision Denying Motion to Dismiss (Aug. 3, 2022) (Dkt. 213)
- Order Denying Motion to Dismiss (Dkt. 215)
- First Opinion on Motions in Limine Order (*United States v. Sutton*, 636 F. Supp. 3d 179 (D.D.C.2022) (Dkt. 321)
- Order Resolving Motions in Limine (Dkt. 337)
- Oral Decision Excluding Hylton-Brown's Criminal History and Gang Association (Tr. of Motions Hearing, Oct. 24, 2022)
- Second Motion In Limine Opinion (*United States v. Sutton*, No. 21-0598, 2022 WL 17335969 (D.D.C. Nov. 30, 2022) (Dkt. 382)
- Opinion on Daubert Motions (United States v. Sutton, 642 F. Supp. 3d 57 (D.D.C. 2022)) (Dkt. 364)
- Oral Ruling Denying Rule 29 Motion (Trial Tr., Nov. 21, 2022 PM)
- Jury Instructions (Dkt. 435)
- Opinion Denying Motion for Judgment of Acquittal (Dkt. 526)
- Opinion Denying Motion For New Trial (Dkt. 530)

**C. Related Cases**

Sutton's co-defendant in the district court, Lieutenant Andrew Zabavsky, has appealed his conviction. That appeal is currently before this Court. *See* 24-3142.

## Table of Contents

Statement Regarding Oral Argument ....................................................... vii

Glossary.......................................................................................................1

Statement of Jurisdiction............................................................................1

Issues Presented ..........................................................................................2

Introduction.................................................................................................4

Statement of the Case.................................................................................6

I.     Background..........................................................................................6

     A.    Kennedy Street .........................................................................6

     B.    CST Is Deployed to Kennedy Street To Counter KDY. .......8

     C.    Sutton's Knowledge of Kennedy Street and KDY. .............9

II.    October 23, 2020 ...............................................................................10

     A.    Officer Pitt Reports a Suspected Gang-Related Incident to CST. ......10

     B.    Sutton Knew of Hylton-Brown's Extensive Criminal History. ..........10

     C.    Hylton-Brown's Criminal History and KDY-Affiliation Informed CST's Assessment of Reporting. .........................13

     D.    Based on Pitt's Reporting and Hylton-Brown's History, CST Decides to Locate Hylton-Brown.......................................14

     E.    Hylton-Brown Recklessly Flees a Lawful Stop ..................15

     F.    Hylton-Brown Was Known To Flee Only When In Possession of Guns or Drugs. .................................................18

     G.    Hylton-Brown Turns in Front of Oncoming Traffic............18

III.   Trial...................................................................................................20

     A.    DOJ Brings Novel Charges. ................................................20

B.     Sutton Is Deprived of a Meaningful Defense......................................21

     1.     Sutton Is Prohibited from Making Any Defense that Is Unique to Police. ...................................................21

     2.     The Prosecution Is Permitted To Rely Heavily on the General Order. .........................................................22

     3.     The District Court Excludes Hylton-Brown's Criminal History, KDY Affiliations, and the $3,136 Taped to His Legs. ...................................................................22

     4.     The Court Refuses To Instruct on Reckless Flight. ..............22

     5.     The Court Refuses To Instruct the Jury on the "Possible Federal Offense" Underlying the Obstruction Charges, or Allow Sutton to Argue There Was No Possible Federal Offense. .......................................22

C.     The Prosecution Weaponizes the Pretrial Rulings to Mislead the Jury. ................................................................23

     1.     The General Order Is the Centerpiece of the Government's Case. .............................................23

     2.     The Prosecution Falsely Claims that Sutton Pursued Hylton-Brown Solely for Traffic Violations.........................24

     3.     Officers Pitt and Novick Are Not Allowed To Explain Why They Suspected Hylton-Brown of Criminality. ...........25

     4.     The Prosecution Suggests—Without Evidence—That Sutton Had Nefarious Motives. ...............................28

     5.     The Prosecution Falsely Claims that Sutton Was Charged With "Covering Up" a Murder. ..............................28

IV.     Conviction.................................................................29

Standard of Review.......................................................29

Summary of Argument ...................................................29

Argument...................................................................32

I.      The Evidence Was Insufficient to Support a Murder Conviction. ................32

II.    The District Court Erred by Denying Officer Sutton a Law Enforcement Privilege Defense. ........................................................39

      A.     D.C.'s Murder Statute Incorporates Common Law Defenses. ...........39

      B.     The Common Law Recognized a Law Enforcement Authority Defense. ...............................................................................40

      C.     D.C. Looks to Fourth Amendment Cases To Determine Common Law Reasonableness. ............................................................41

      D.    No Reasonable Jury Could Find that Sutton's Brief, Low-Speed "Pursuit" of Hylton-Brown was Not Authorized by Law. .................42

           1.     Sutton Was Authorized To Detain Hylton-Brown. ...............43

           2.     Officer Sutton Used Reasonable Means To Attempt a Detention. ..............................................................44

           3.     An Alleged Violation of an Internal Rule Cannot Render a Police Action Unauthorized for the Purposes of Common Law Privilege. ....................................45

      E.     The District Court Erred by Refusing a Law Enforcement Privilege Instruction. ........................................................46

III.   The District Court Erred in Instructing the Jury. ...........................47

      A.     The District Court Failed To Instruct on the "Reasonable Officer" Standard. ...................................................................47

      B.     The District Court Erred By Making the General Order the Only Justification Standard the Jury Could Hear. ...............................47

      C.     The District Court Erred by Refusing to Instruct the Jury on *Terry* Stops. ...........................................................................49

      D.     The District Court Failed To Instruct the Jury that Reckless Flight Is a Felony. ...................................................................50

IV.   The District Court Erred By Excluding Hylton-Brown's Criminal History and Gang Membership. .......................................................52

A.      Reverse-404(b) Evidence Is Subject to a Lower Standard. ................52

B.      Hylton-Brown's Criminal History and Gang Association Was
        Relevant to Show the Basis for the "Pursuit." ....................................54

C.      The District Court Erroneously Excluded the $3128. ........................58

V.      The District Court Erred by Prohibiting Sutton from Presenting
        Testimony on the Standard of Care for Police Pursuits. ...............................60

VI.     The Obstruction Conviction Must Be Reversed .............................................61

A.      The Prosecution Did Not Show That Information About the
        Pursuit "Relat[ed] to the Commission or Possible Commission
        of a Federal Offense." ...........................................................................61

B.      The District Court Erred By Refusing To Instruct the Jury on
        the Nature or Elements of the Possible Federal Offense. ..................63

C.      The Prosecutor's Misleading and Uncorrected Statements
        Violated Due Process. ...........................................................................64

D.      The District Court Erred by Precluding Sutton from Arguing
        that He Did Not Violate Hylton-Brown's Constitutional Rights. ........64

# Table of Authorities

**Page(s)**

CASES

*Abney v. D.C.*,
   580 A.2d 1036 (D.C. 1990) ..........................................................39, 46

*Agushi v. Duerr*,
   196 F.3d 754 (7th Cir. 1999) .................................................................54

*Amador County v. United States DOI*,
   772 F.3d 901 (D.C. Cir. 2014)...............................................................29

*Atwater v. City of Lago Vista*,
   532 U.S. 318 (2001)..........................................................................43, 44

*Banks*, 646 A.2d at 974 .............................................................................38, 39

*Blackwell v. Maryland*,
   369 A.2d 153 (Md. 1976) .......................................................................34

*Bowden*, 600 F.2d at 284...........................................................................61

*Boyer v. State*,
   594 A.2d 121 (Md. Ct. App. 1991)...................................34, 35, 37, 38

*Bullins v. Schmidt*,
   369 S.E.2d 601 (N.C. 1988)............................................................35, 37

*Bushrod v. D.C.*,
   521 F. Supp. 3d 1 (D.D.C. 2021).....................................................42, 43

*Byrd v. United States*,
   500 A.2d 1376 (D.C. 1985) ............................................................40, 46

*Coleman v. United States*,
   948 A.2d 534 (D.C. 2008) .......................................................................33

*Comber v. United States*,
   584 A.2d 26 (D.C. 1990) ............................... 30, 32, 33, 39, 40, 41, 43

*Commonwealth v. Ludwig*,
   874 A.2d 623 (Pa. 2005)....................................................................33, 34

*County of Sacramento v. Lewis*,
523 U.S. 833 (1998)................................................................34, 45, 46, 59, 63

*D.C. v. Chambers*,
965 A.2d 5 (D.C. 2009) ..........................................................................37

*D.C. v. Chinn*,
839 A.2d 701 (D.C. 2003) .......................................................................42

*D.C. v. Hawkins*,
782 A.2d 293 (D.C. 2001) .............................................................35, 36, 37

*D.C. v. Henderson*,
710 A.2d 874 (D.C. 1998) .............................................................36, 37, 39

*D.C. v. Walker*,
689 A.2d 40 (D.C. 1997) ............................ 34, 35, 36, 37, 38, 39, 48, 49, 50, 57

*Duggan v. D.C.*,
783 A.2d 563 (D.C. 2001) .........................................................35, 36, 37, 49

*Etheredge v. D.C.*,
635 A.2d 908 (D.C. 1993) .............................................................41, 42, 45

*Evans-Reid*, 930 A.2d at 945 n.23 .........................................................43

*Fischer v. United States*,
144 S. Ct. 2176 (2024)..............................................................................64

*Fowler v. N.C. Dep't of Crime Control*,
376 S.E.2d 11 (N.C. Ct. App. 1989)........................................35, 38, 63, 64

*Garner*, 471 U.S. at 11-12 .....................................................................47

*Graham v. Connor*,
490 U.S. 386 (1989)........................................................ 21, 42, 43, 45, 46, 62

*Illinois v. Wardlow*,
528 U.S. 119 (2000)........................................................................44, 45

*Jackson v. D.C.*,
412 A.2d 948 (D.C. 1980) .................................................................41, 42

*Jenkins v. D.C.*,
  223 A.3d 884 (D.C. 2020) ...................................................................43

*Jennings v. United States*,
  993 A.2d 1077 (D.C. 2010) ...............................................................33

*Johnson v. D.C.*,
  490 F. Supp. 3d 144 (D.D.C. 2020) ...................................................41

*Jones v. United States*,
  172 A.3d 888 (D.C. 2017) .................................................................40

*Jones* v. *United States*,
  529 U. S. 848 (2000) .........................................................................64

*Kansas v. Glover*,
  589 U.S. 376 (2020) ..........................................................................45

*Knight v. Miami-Dade Cty.*,
  856 F.3d 795 (11th Cir. 2017) ..........................................................61

*Lewis v. D.C.*,
  793 F.2d 361 (D.C. Cir. 1986) ..........................................................55

*Logan v. United States*,
  483 A.2d 664 (D.C. 1984) .................................................................43

*Lorance v. Commandant*,
  13 F.4th 1150 (10th Cir. 2021) ...........................................................2

*Mendoza v. Gates*,
  19 F. App'x 514 (9th Cir. 2001) ........................................................61

*Muldrow v. Re-Direct, Inc.*,
  493 F.3d 160 (D.C. Cir. 2007) ...........................................................29

*Mullaney v. Wilbur*,
  421 U.S. 684 (1975) ..........................................................................41

*Nevada v. Jackson*,
  569 U.S. 505 (2013) ..........................................................................54

*Newby v. United States*,
    797 A.2d 1233 (D.C. 2002) ................................................................40

*Ohio v. White*,
    29 N.E.3d 939 (Oh. 2015)......................................................41, 48, 55

*Old Chief v. United States*,
    519 U.S. 172 (1997)..........................................................................59

*Peak v. Ratliff*,
    408 S.E.2d 300 (W. Va. 1991)......................................................35, 38

*Pennsylvania v. Ritchie*,
    480 U.S. 39 (1987)............................................................................54

*People v Maldonado*,
    18 N.E.3d 391 (N.Y. 2014)..............................................................33

*Powell v. United States*,
    485 A.2d 596 (D.C. 1984) ................................................................33

*Riley v. State*,
    133 A.3d 1219 (Md. 2016) ................................................................41

*Rogala v. D.C.*,
    161 F.3d 44 (D.C. Cir. 1998)......................................................42, 43

*Rogers v. Ingersoll-Rand Co.*,
    144 F.3d 841 (D.C. Cir. 1998)..........................................................30

*Saarinen*, 644 N.E.2d at 989 ................................................................38

*Scales v. D.C.*,
    973 A.2d 722 (D.C. 2009) ........................................................41, 43

*Scott v. Harris*,
    550 U.S. 372 (2007)....................................................................38, 46

*Shatsky v. PLO*,
    955 F.3d 1016 (D.C. 2020) ..............................................................30

*State v. Pagotto*,
    762 A.2d 97 (Md. 2000) ........................................................39, 48, 61

*Thomas v. United States*,
   557 A.2d 1296 (D.C. 1989) ...............................................................40

*Tillery v. D.C.*,
   227 A.3d 147 (D.C. 2020) ............................................................36, 49

*Tinius v. Choi*,
   77 F.4th 691 (D.C. Cir. 2023)......................................................41, 45

*United States v. Aboumoussallem*,
   726 F.2d 906 (2d Cir. 1984) ........................................................53, 54

*United States v. Alghazouli*,
   517 F.3d 1179 (9th Cir. 2008) ...........................................................65

*United States v. Bailey*,
   405 F.3d 102 (1st Cir. 2005)...............................................................62

*United States v. Burks*,
   470 F.2d 432 (D.C. Cir. 1972) ...........................................................55

*United States v. Cassell*,
   292 F.3d 788 (D.C. Cir. 2002) ...........................................................53

*United States v. Castle*,
   825 F.3d 625 (D.C. Cir. 2016) ...........................................................44

*United States v. Douglas*,
   482 F.3d 591 (D.C. Cir. 2007) ...........................................................53

*United States v. Dykes*,
   406 F.3d 717 (D.C. Cir. 2005) ...........................................................45

*United States v. Edmonds*,
   240 F.3d 55 (D.C. Cir. 2001) .......................................................44, 45

*United States v. Guadalupe*,
   402 F.3d 409 (3d Cir. 2005) ...............................................................63

*United States v. Guardado*,
   699 F.3d 1220 (10th Cir. 2012) .........................................................44

*United States v. Jackson*,
  528 A.2d 1211 (D.C. 1987) ..............................................................40

*United States v. James*,
  169 F.3d 1210 (9th Cir. 1999) ..........................................................55

*United States v. Krezdorn*,
  639 F.2d 1327 (5th Cir. 1981) ..........................................................54

*United States v. Lake*,
  472 F.3d 1247 (10th Cir. 2007) ........................................................65

*United States v. Lewis*,
  701 F.2d 972 (D.C. Cir. 1983) ..........................................................59

*United States v. McCarson*,
  527 F.3d 170 (D.C. Cir. 2008) .....................................................52, 53

*United States v. McGill*,
  815 F.3d 846 (D.C. Cir. 2016) ..........................................................29

*United States v. Montelongo*,
  420 F.3d 1169 (10th Cir. 2005) ........................................................54

*United States v. Murray*,
  474 F.3d 938 (7th Cir. 2007) ............................................................54

*United States v. Olugbenga et al.*,
  No. 23-cr-202, Dkt. 1 ..........................................................13, 14, 15

*United States v. Olugbenga et al.*,
  No. 23-cr-202, Dkt. 38 ...................................................................7, 8

*United States v. Peterson*,
  483 F.2d 1222 (D.C. Cir. 1973) ........................................................40

*United States v. Pope*,
  313 A.3d 565 (D.C. 2024) .................................................................45

*United States v. Schaffer*,
  240 F.3d 35 (D.C. Cir. 2001) ..............................................................2

*United States v. Seals*,
    419 F.3d 600 (7th Cir. 2005) ...............................................................53

*United States v. Stevens*,
    935 F.2d 1380 (3d Cir. 1991) .......................................................53, 54

*United States v. Sutton*,
    636 F. Supp. 3d 179 (D.D.C.2022) (Dkt. 321) ...................................... ii

*United States v. Sutton*,
    No. 21-0598, 2022 WL 17335969 (D.D.C. Nov. 30, 2022) (Dkt. 382) .............. ii

*United States v. Williams*,
    836 F.3d 1 (D.C. Cir. 2016) ................................................................66

*United States v. Wilson*,
    605 F.3d 985 (D.C. Cir. 2010) ...........................................................65

*Whitman v. United States*,
    574 U.S. 1003 (2014) ........................................................................51

*Whren v. United States*,
    517 U.S. 806 (1996) ....................................................................44, 47

*Williams v. United States*,
    314 A.3d 1158 (D.C. 2024) ...........................................................33, 34

*Williams v. United States*,
    569 A.2d 97 (D.C. 1989) ...................................................................40

**RULES**

Fed. R. Evid. 104(b)......................................................................55, 56

Fed. R. Evid. 403 ...............................................................................54

Fed. R. Evid. 404 ...............................................................................54

Fed. R. Evid. 404(a)(2)(B)..................................................................54

**STATUTES**

18 U.S.C. § 242 ...................................................................................66

18 U.S.C. § 1291 ......................................................................1

18 U.S.C. § 1503 ....................................................................32

18 U.S.C. § 1512 ....................................................62, 63, 65

D.C. Code § 2-412 ................................................................34

D.C. Code § 5–127.04 ..........................................................46

D.C. Code § 5–127.04.3 ........................................................44

D.C. Code § 22-2103 ......................................................32, 40

D.C. Code § 23–581(a)(1)(B) ..............................................43

## OTHER AUTHORITIES

Fourth Amendment ....................................42, 43, 47, 62, 63

Fifth Amendment ..................................................................54

Sixth Amendment ..................................................................54

DOJ Press Release, *Armed Carjacking Added to a 55-Count Superseding Indictment Charging Members of the Violent KDY Drug Crew* (Feb. 23, 2024), https://www.justice.gov/usao-dc/pr/armed-carjacking-added-55-count-superseding-indictment-charging-members-violent-kdy-drug ..............7, 9

MPD General Order 301.03 ............................1, 20, 38, 39, 51

## Statement Regarding Oral Argument

Officer Sutton respectfully requests oral argument.

## Glossary

**MPD:** Metropolitan Police Department

**CST:** Crime Suppression Team

**DOJ:** Department of Justice

**KDY:** The Kennedy Street Crew

**SOC:** Statement of the Case

**General Order:** MPD General Order 301.03

## Statement of Jurisdiction

The district court lacked subject matter jurisdiction because the obstruction counts do not state a federal offense and the second-degree murder count is a state charge. This Court has jurisdiction to hear this appeal under 18 U.S.C. § 1291. This appeal is timely. Dkt. 677, 681. This appeal is not moot because, despite accepting a full presidential pardon, Officer Sutton faces significant collateral consequences from the district court's judgement, including an ongoing administrative disciplinary proceeding and difficulty obtaining employment. *See United States v. Schaffer*, 240 F.3d 35 (D.C. Cir. 2001); *Lorance v. Commandant*, 13 F.4th 1150 (10th Cir. 2021).

# Issues Presented

## Murder Conviction

1. Whether a police officer commits depraved heart murder when he follows, for three minutes at low speeds, a suspect who flees a lawful stop and whom the officer reasonably suspects has committed or is about to commit a serious crime?

2. Whether a police officer can raise a law enforcement privilege defense to a charge of second-degree murder arising from his on-duty attempt to detain a fleeing suspect.

3. Whether the jury instructions erroneously:

   a. Failed to instruct that Officer Sutton's actions should be judged from the prospective of a reasonable police officer balancing risks against law enforcement need;

   b. Instructed the jury to only consider the risk involved and not whether that risk was justified;

   c. Failed to instruct on *Terry* stops;

   d. Failed to instruct that reckless flight is a felony.

4. Whether the district court erred by refusing to admit, or instruct on, any rule or standard that governed whether a police pursuit is justified except the MPD General Order.

5. Whether the district court applied the wrong legal standard to the admissibility of "Reverse-404(b)" evidence.

6. Whether the district court erred by excluding evidence of the decedent's criminal history and gang affiliation.

7. Whether the district court erred by excluding evidence of the decedent's motive to flee.

8. Whether the district court erred by excluding evidence that the standard of care.

## Obstruction Convictions

1. Whether a police officer hinders the communication of information "relating to the commission or possible commission of a federal offense," where the underlying facts of and statements about an event, under controlling Supreme Court precedent, could not possibly constitute a federal offense.

2. Whether the district court erred by refusing to identify the "possible federal offense" underlying the obstruction charges or instruct on the underlying offense's nature and elements.

3. Whether the district court erred by failing to give a curative instruction that "second degree murder is not a federal offense" after the prosecution repeatedly and falsely suggested that the offense underlying the federal obstruction charges was the charged second-degree murder

4. Whether Officer Sutton should have been permitted to argue that following Hylton-Brown did not constitute a federal civil rights violation in order to rebut the indictment's allegation that information about the pursuit constituted "information relating to the commission and possible commission of a federal offense."

## **Introduction**

Kennedy Street is D.C.'s most dangerous street. According to the Justice Department, it contains several "prolific open air drug trafficking markets" operated by a violent gang called the Kennedy Street Crew, or "KDY." In response to multiple KDY-related shootings, D.C. police established a permanent presence on Kennedy Street and staffed it with officers trained to stop violent crime before it starts. Given his intimate knowledge of the neighborhood, Officer Terence Sutton was a natural choice for this dangerous assignment.

One Friday night, Officer Sutton, Lieutenant Andrew Zabavsky, and other officers stationed on Kennedy Street received a concerning report from an experienced patrol officer: she had stopped a fight involving Karon Hylton-Brown earlier that day, and Hylton-Brown was now back and appeared to be "looking for someone." Hylton-Brown was well-known to the officers: he had twenty-one prior arrests, including for gun possession, armed robbery, and drug-dealing, and regularly associated with known-KDY members in Kennedy Street's open-air drug markets. The patrol officer believed the altercation was indicative of KDY "infighting."

Lieutenant Zabavsky immediately ordered Sutton and three other officers to find Hylton-Brown. When they did, Hylton-Brown darted away on a moped, ran a redlight, and nearly collided with an oncoming car. Hylton-Brown proceeded to lead the officers on a circuitous, four block route at low speeds (Hylton-Brown's moped

was incapable of exceeding 30 mph), which ended when Hylton-Brown drove in front of an oncoming car. At the time of the accident, Hylton-Brown had oxycodone, benzodiazepine, and THC in his bloodstream and $3128 taped to his thighs.

The Justice Department charged Sutton under the unprecedented theory his actions amounted to reckless murder because they allegedly violated an MPD order prohibiting officers from "pursuing a vehicle for the purpose of affecting a stop for a traffic violation." At trial, the district court precluded Sutton from raising a justification defense: that is, from arguing that he was authorized as a police officer to use reasonable means to affect a lawful stop. Instead, the only standard the district court admitted or instructed on that purported to govern when a police pursuit is authorized or justified was the MPD Order.

Still, Sutton could have shown that he complied with the MPD order because the "pursuit" was not solely, or even primarily, "for the purpose of affecting a stop for a traffic violation," but rather due to Hylton-Brown's suspected involvement in an ongoing, gang-related altercation and his dangerously reckless driving. But the district court excluded all evidence of Hylton-Brown's criminal history and KDY-affiliation, as well as the fact that, minutes before the pursuit, the patrol officer told Sutton she believed the altercation she witnessed was indicative of KDY "infighting." This allowed the prosecution to tell the false story that Sutton simply

picked a kid off the street who was "not doing a damn thing wrong," and whose only crime was "driving on the sidewalk," and "chased him to his death."

Sutton was also charged with seeking to prevent information "related to the … possible commission of a federal offense" from reaching federal officials, for allegedly minimizing the injuries to Hylton-Brown when first reporting the matter to his Watch Commander, and for telling the Watch Commander that he "followed" Hylton-Brown for approximately two minutes, rather than characterizing the incident as a "pursuit" within the meaning of the MPD General Order. Under controlling Supreme Court precedent, however, Officer Sutton's actions could not possibly constitute a federal civil rights crime. Yet the jury would never know that because the district court refused to instruct the jury on the nature or elements of the alleged "possible federal offense" underlying the obstruction charge and precluded Sutton from arguing that there was no underlying federal offense.

## Statement of the Case

### I.    Background

#### A.    Kennedy Street

Kennedy Street is notorious for drug activity and gang-related violence. *See* Pretrial Hr'g (10/17/22), at 26 (Officer Novick), 148-52 (Officer Scott). Police have long attributed this violence to the Kennedy Street Crew ("KDY"). *See id.* at 26 (Officer Novick), 114:2-7 (Officer Hubyk). According to DOJ, "[t]he KDY crew is a driver of the cycle of violence associated with drug trafficking and firearms that has

plagued the Kennedy Street Neighborhood for years," and caused "a marked rise in crimes of violence and homicides." *United States v. Olugbenga et al.*, No. 23-cr-202, Dkt. 38, at 4. From 2019-2023, KDY operated several "prolific 'open air' drug trafficking markets" on Kennedy Street, and used "firearms," "intimidation and acts of violence" to "promote [their] reputations" and "secure their drug trafficking operation." *Id.*, Dkt. 1, at 1, 4. During that period, police seized more than forty firearms—including eight machineguns—from KDY. *See* DOJ Press Release, *Armed Carjacking Added to a 55-Count Superseding Indictment Charging Members of the Violent KDY Drug Crew* (Feb. 23, 2024), https://www.justice.gov/usao-dc/pr/armed-carjacking-added-55-count-superseding-indictment-charging-members-violent-kdy-drug.

Two of the "prolific 'open-air' drug markets" KDY controlled were located at Fifth & Kennedy, in front of the "Starlight" convenience store, and Georgia Avenue & Kennedy. *See* Pretrial Hr'g (10/14/22), at 16-18, 23, 54 (Officer Pitt); Pretrial Hr'g (10/17/22), at 16, 96 (Officer Novick); *United States v. Olugbenga et al.*, No. 23-cr-202, Dkt. 38, at 4. Shootings attributed to KDY had occurred at both locations. Pretrial Hr'g (10/14/22), at 16-18, 23, 54 (Officer Pitt); Pretrial Hr'g (10/17/22), at 16 (Officer Novick), at 149-52 (Officer Scott).

**B.     CST Is Deployed to Kennedy Street to Counter KDY.**

In response to community outrage over shootings at Fifth & Kennedy, the MPD deployed a Crime Suppression Team (CST) to do "proactive policing." Pretrial Hr'g (10/17/22), at 16:11-19 (Officer Davis), 109 (Officer Hubyk). CST's mission is to combat violent crime, drugs, and gang activity; it does not target traffic violations or petty crimes. Trial Tr. (11/10/22) at 64:6-10 (Al-Shrawi). CST established permanent police presences, dubbed "fixed posts," at Fifth & Kennedy and Seventh & Kennedy. Pretrial Hr'g (10/14/22), at 25, 33-34, 55-56.

CST officers knew criminal histories and gang-associations of the individuals who hung-out on Kennedy Street.  Pretrial Hr'g (10/17/22), at 28 (Officer Novick). They frequently shared intelligence on these matters. Pretrial Hr'g (10/14/22), at 10-11, 35 (Officer Pitt), (10/17/22) at 28 (Officer Novick). CST also used a "beat book" that contained the criminal histories and gang associations of Kennedy Street regulars. *Id.* at 27. CST also gained familiarity with KDY through daily observations. Pretrial Hr'g (10/14/22), at 12-15, 35 (Officer Pitt), (10/17/22) at 26:14-17 (Officer Novick). Indeed, it would be hard to work on Kennedy Street and not know who associated with KDY because "[t]he KDY crew was not very shy about their involvement"; they "flaunted" it. Pretrial Hr'g (10/17/22), at 28:1-5 (Officer Novick).

### C. Sutton's Knowledge of Kennedy Street and KDY.

Few officers had better knowledge of the people who frequented Kennedy Street than Sutton. Pretrial Hr'g (10/14/22), at 21:1-11 (Officer Pitt); (10/17/22) at 111:18-112:1; 112:19-21; 116:24-117:3 (Officer Hubrick); Trial Tr. (11/4/22) at 27:6-28:15 (Officer Tejera). Sutton spent his entire ten-year career in the Fourth District, where Kennedy Street is located. He received more than sixty commendations, including Fourth District Officer of the Year in 2012. Def. Exs. 300O-R. Sutton never discharged his firearm and was never found to have used excessive force. Rather, he was known for engaging in friendly interactions with the people who hung-out on Kennedy Street. Pretrial Hr'g (10/14/22), at 21 (Pitt); (10/17/22) at 113:10-14 (Hubrick). Even prosecution witnesses admired Sutton: "Sutton is a person that talks to everybody … it's different from anything I experienced before … [h]e was quick to get a laugh out of people, even people that are currently being arrested." Trial Tr. (11/4/22) at 28:5-15 (Tejera).

Sutton was known to study written intelligence on Kennedy Street regulars, including the "beat book," and other arrest reports, Pretrial Hr'g (10/17/22), at 33:6-18 (Officer Novick). One CST officer described how he and Sutton "would get there every day a little bit earlier" to go over reports from the day before and how he saw Sutton routinely use the beat book. *Id.* at 132:3-133:3 (Scott).

## II.     October 23, 2020

### A.     Officer Pitt Reports a Suspected Gang-Related Incident to CST.

On October 23, 2020, Officer Sutton was working the night shift with three other CST officers (Novick, Tejera, and Al-Shrawi). Dkt. 530, at 18. For safety reasons, CST officers typically travel four to a car. Around 10:01 pm, Officer Katheryn Pitt reported to Sutton, Novick, and Lieutenant Zabavsky that, earlier that day, she saw Hylton-Brown "almost get into a fight with another KDY member" at the corner of Georgia Ave & Kennedy.  Pretrial Hr'g (10/14/22), at 36:16-25, *id.* at 62:16-24. Pitt reported that the fight was about money, *id.* at 47:18-25, and that "[t]here probably would have been a [physical] fight if I wasn't sitting right there." *Id.* at 40:18-19. Pitt further relayed that she saw Hylton-Brown again that day, driving "recklessly" on a moped and crossing-double lines. *Id.* at 42-43, 64-65. Pitt stated that "she had recently seen [Hylton-Brown] back in the area on a moped driving around erratically and not like with a particular purpose of where he was going," Pretrial Hr'g (10/17/22), at 43:12-15 (Officer Novick), that is, "driving in a way that indicated he was looking for somebody," *id.* at 67:17-19. Pitt told CST she believed Hylton-Brown was involved in "infighting … between Kennedy Street members." Pretrial Hr'g (10/14/22), at 41:17-19; *see also id.* 36:21-25, 69:5-13.

### B.     Sutton Knew of Hylton-Brown's Extensive Criminal History.

To say "Hylton-Brown was known to the CST officers," Dkt. 526, at 18, is an understatement. Hylton-Brown had twenty-one prior arrests, including for drug

distribution, gun possession, and armed robbery. Dkt. 272 Ex. A (MPD Criminal History Report). Some of these arrests resulted in convictions, Pretrial Hr'g (10/17/22), at 198:7-10, including for gun possession, *id.* at 141:4-15. And the armed robbery case was dismissed on the eve of trial. *Id.* at 137-39. Hylton-Brown was also known to have a temper: police were repeatedly called to his home for domestic violence complaints, which resulted in a restraining order. Dkt. 272 Ex. A, at 14-18; Dkt. 343, at 1-6. A police report from one of Hylton-Brown's arrests by CST contained—in large red letters under "Cautions"—"Assaulted Police Officer," "Threatened Police Officer," and "Violent Tendencies." 10/14/22 Pretrial Hearing, Sutton Exhibit 402.

Within the MPD, Hylton-Brown was widely believed to be a KDY member: indeed, MPD intelligence listed Hylton-Brown as a "validated member" of KDY— a designation made by MPD intelligence after a formal administrative process. Pretrial Hr'g (10/14/22), at 104-05, 108-09 (Officer Murrock). Hylton-Brown's KDY affiliation was also listed in the "beat book" described above. *Id.* at 87-89.

Hylton-Brown's criminal history and KDY affiliation was well known to Officers Sutton, Pitt, and all of CST. Multiple officers testified that they saw Sutton interact with Hylton-Brown regularly, that they spoke with Sutton about Hylton-Brown's criminal history, and that Sutton knew of Hylton-Brown's KDY

association. Pretrial Hr'g (10/17/22), at 116-20, 122 (Hubriyk), 101:21-102:9 (Novick); 141:19-22 (Scott); Trial Tr. (11/4/22 AM) at 29:12-13 (Tejera).

CST officers saw Hylton-Brown "daily," Pretrial Hr'g (10/14/22), at 15:18-20, 16:8-21 (Pitt), had "around a hundred interactions" with him, Pretrial Hr'g (10/17/22), at 141:23-142:2 (Scott), and confirmed that "Hylton was well known," Pretrial Hr'g (10/14/22), at 126:10 (Murrock). Even the government's witness admitted that "we talked to Karon a lot." Trial Tr. (11/4/22 AM) at 29:12-13 (Tejera). Multiple CST officers had arrested Hylton-Brown and seized firearms from him. Pretrial Hr'g (10/14/22), at 16 (Pitt); (10/17/22), at 136-147 (Scott). And new CST officers would be briefed on Hylton-Brown's criminal history and KDY affiliation. Pretrial Hr'g (10/17/22), at 83:13-17 (Novick), 116-19 (Hubriyk).

CST officers would frequently see Hylton-Brown at Fifth & Kennedy, with known KDY members. Pretrial Hr'g (10/14/22), at 18:3-6, 19:1-7, 52:23-53:4 (Pitt), (10/17/22), at 72:25-73:3 (Novick), 142:3-7 (Scott). The best example of Hylton-Brown's open gang association were videos posted to social media, which showed Hylton-Brown with other known KDY members at Fifth & Kennedy displaying guns, drugs, and cash. Pretrial Hr'g (10/14/22), at 110-11 (Murrock).[1] An MPD intelligence officer identified the individuals in these videos as Hylton-Brown, Khali

---

[1] Fourth District officers frequently viewed social media videos created by suspected gang members and shared that intelligence via email. Pretrial Hr'g (10/14/22), at 24-25 (Pitt), 109-10 (Murrock).

Brown, Antoine Baily, and Meko Brown. *Id.* at 110, 113. The prosecution feigned ignorance about those individuals, *id.* at 116:4-10, suggested the guns in videos were merely "props," *id* at 114:8-14, and mocked the idea of "Hylton being somehow associated with KDY," (10/17/22), at 193:21-22.

However, at the very same time, DOJ was drafting an indictment, which it dropped three months after Sutton's trial, charging Bailey and Khali Brown with committing numerous crimes on behalf of KDY, including assault with a deadly weapon, carrying a machine gun during a drug trafficking offense, and possessing a firearm with an obliterated serial number. *See* No. 23-cr-202, Dkt. 1, Counts 1, 7-10, 13, 17. Meko Brown was also a known KDY member who was "caught on surveillance video discharging a firearm at 7th and Kennedy." Pretrial Hr'g (10/14/22), at 26:5-7.

### C. Hylton-Brown's Criminal History and KDY-Affiliation Informed CST's Assessment of Pitt's Reporting.

Given this background, Pitt's reporting alarmed the CST officers. Pitt had an excellent reputation. Pretrial Hr'g (10/17/22), at 89-90 (Officer Novick); Trial Tr. (11/14/22 AM) at 88 (Officer Al-Shrawi). She regularly patrolled Kennedy Street by bicycle, providing intimate knowledge of KDY. Pretrial Hr'g (10/14/22), at 20:4-10. Pitt explained that different sects of KDY occupied different corners, and Hylton-Brown "didn't frequent the 5400 block of Georgia … he usually frequented

the 7th and Kennedy and 5th and Kennedy areas," which made the altercation at 5400 Georgia more concerning. *Id.* at 40:5-9, 41:10-20.

The CST Officers who heard Pitt's reporting "had a consensus that that was kind of odd behavior for [Hylton-Brown] and … were concerned based on his history that retaliation might be a possibility and we thought it was worth trying to locate him and conducting a stop." Pretrial Hr'g (10/17/22), at 44:6-10, 71:8-15 (Novick). Certainly, "the fact that Hylton-Brown had prior arrests for guns and was a validated gang member… contributed" to CST's concerns that Hylton-Brown could be armed and "perhaps back for retaliation." *Id.* at 93:4-11.

### D. Based on Pitt's Reporting and Hylton-Brown's History, CST Decides to Locate Hylton-Brown.

Officer Novick testified that, at the end of CST's discussion with Pitt, Lieutenant Zabavsky "said something to the effect of let's go find [Hylton-Brown] and walked to his car." *Id.* at 44. The government's witnesses, Officers Al-Shrawi and Tejera, testified that they were in the car and did not hear much of Pitt's reporting, which occurred outside. Trial Tr. (11/2/22 PM), at 45:1-13 (Tejera), (11/10/22 PM) at 40:5 (Al-Shrawi). But they did confirm that Pitt reported about an altercation involving Hylton-Brown, Tejera at 45:14-19, Al-Shrawi at 40-41, and that, "seconds" later, they went looking for Hylton-Brown. Tejera at 47:16-20; Al-Shrawi at 45:21-24.

Officer Sutton drove with Novick, Al-Shrawi, and Tejara, while Lieutenant Zabavsky followed. The officers drove east towards Fifth & Kennedy because that is where Pitt had last seen Hylton-Brown. Trial Tr. (11/10/22 PM), at 48:9-22 (Al-Shrawi), (11/29/22 PM), at 70:3-22 (Novick). At that time, their "intent was to conduct an investigative stop." Trial Tr. (11/29/22 PM) at 70:3-15 (Novick).

### E. Hylton-Brown Recklessly Flees a Lawful Stop

When the officers drove east on Kennedy Street, they immediately (at 10:07pm) found Hylton-Brown on the 400 block of Kennedy Street, sitting on a moped. Trial Tr. (11/10/22 PM), at 52-54 (Al-Shrawi). After the officers made a U-turn and pulled behind Hylton-Brown, he began riding the moped on the sidewalk without a helmet. *Id.* at 57:14-23 (Al-Shrawi), (11/29/22 PM), at 72:1-18 (Novick). When Sutton and Zabavsky pulled up behind Hylton-Brown and attempted to speak to him, Hylton-Brown quickly came off the sidewalk and darted through a redlight to head south on Fifth Street, in the process cutting in front of the CST car and a pedestrian car that was entering the intersection with a green light. Trial Tr. (11/10/22 PM) at 58:11-62:10 (Al-Shrawi); (11/29/22 PM) at 73:5-6, 74:11-17 (Novick); (12/2/22) at 16:13-17:4 (Novick).

This sequence was captured on video:







Gov. Ex. 302 (camera 3 at 10:08:25-30).

Sutton and Zabavsky made left turns and followed Hylton-Brown down Fifth Street, both with their lights on. Trial Tr. (11/29/22) at 74:11-17 (Novick). When Hylton-Brown briefly stopped, Sutton stated: "let me holla at you"; Hylton-Brown responded, "fuck you" and drove away. *Id.* at 74:3-10. The CST cars then followed Hylton-Brown, with their lights on, and occasionally their sirens too. Trial Tr. (11/29/22), at 73:11-16, 74:11-20 (Novick).

### F. Hylton-Brown Was Known To Flee Only When In Possession of Contraband.

CST officers had "around a hundred interactions" with Hylton-Brown that did not result in flight. Pretrial Hr'g (10/17/22) at 141:23-42:15; 143:5-23 (Scott). Indeed, Sutton and Hylton-Brown were known to "talk to each other" and "have humorous banter." Trial Tr. (11/4/22 AM) at 29:11-19 (Tejera). In CST's experience, a KDY member with multiple arrests is unlikely to flee unless he is involved in criminal activity. Pretrial Hr'g (10/14/22) at 22:6-13 (Pitt); (10/17/22), at 101:2-19 (Novick). Of the hundreds of times that CST officers spoke to Hylton-Brown, he had only fled twice. In one instance, he threw a gun as he fled, Pretrial Hr'g (10/17/22) at 136:17-137:25, 140:11-15 (Scott), and in the other, police found MGMA, a digital scale, and $5,168 in Hylton-Brown's car when they eventually caught him, *id.* at 145:13-146:20; Sutton Pretrial Hearing Exhibit 402.[2] Hylton-Brown's flight, combined with his history, increased CST's suspicion. Trial Tr. (12/1/22 PM), at 76-78:25 (Novick); (12/5/22 PM) at 37:11-40:14 (Novick).

### G. Hylton-Brown Turns in Front of Oncoming Traffic.

As Hylton-Brown drove away, Zabavsky and Sutton followed, with Lieutenant Zabavsky taking the lead, now with his lights and sirens activated. Trial

---

[2] Officer Scott, who witnessed both of these incidents, testified that he would have told Officer Sutton, as well as the rest of CST, about them. Pretrial Hr'g (10/17/22), at 141:19-22, 147:3-23.

Tr. (11/29/22 PM) at 74:14-20 (Novick). The officers "followed Hylton-Brown through the neighborhood for approximately two minutes," Dkt. 526, at 21, while Hylton-Brown rode on the sidewalk, ran red lights and stop signs, crossed double lines, and drove, in Officer Tejera's contemporaneous words, "crazy." Trial Tr. (11/4/22 AM), at 82:3-8 (Tejera); (12/2/22 PM) at 18:1-10 (Novick).

Because Hylton-Brown's moped was incapable of exceeding 30 mph, Dkt. 1, ¶ 20, Sutton could not have exceeded 30 mph while directly following Hylton-Brown. Rather, Sutton only reached 43 mph when he lost sight of Hylton-Brown. Sutton Ex. 800kk; Trial Tr. (11/4/22 AM) at 66-67, 73 (Tejera); (11/29/22), at 77:24-78:7 (Novick).

Sutton followed Hylton-Brown into an alleyway and increased his speed slightly from "[j]ust over 20 miles per hour" to "just over 25 miles per hour," Trial Tr. (11/2/22 PM) at 88-89 (Tejera), but Sutton remained 40 feet from Hylton-Brown, Trial Tr. (11/30/22 PM), at 11:6-13:25 (Langley). At the end of the alley, Hylton-Brown tapped his brakes, but then released them and turned left onto Kennedy Street, Sutton Ex. 900I-K, cutting into the path of a Toyota Scion. Sutton stopped approximately 24 feet from the collision, jumped out of his car and yelled "Karon!" Trial Tr. (11/30/22 PM), at 13:3-7 (Langley); Sutton Ex. 900P. The CST officers rendered first aid and called an ambulance, while Sutton located and interviewed the driver of the Scion. Def. Ex. 100I. Hylton-Brown died at the hospital three days later. At the time of the

accident, Hylton-Brown had oxycodone, benzodiazepine, and THC in his bloodstream and $3128 in cash taped to his thighs. Dkt. Nos. 343, 345, and 382, at 7-10.

## III.  Trial

### A.  DOJ Brings Novel Charges.

Prosecutors charged Sutton with second degree murder, relying primarily on the allegation that Sutton violated a provision of the MPD police chief's general order that "prohibits officers from 'pursuing a vehicle for the purpose of affecting a stop for a traffic violation.'" Indictment ¶ 8 (quoting MPD General Order 301.03) ("General Order"). Prosecutors also charged Sutton with Obstruction of Justice and Conspiracy to Obstruct Justice based primarily on statements Sutton made to his Watch Commander and in a draft report that allegedly "minimized the extent of observable injuries to Hylton-Brown." Indictment ¶¶ 46-47. Sutton's statements were made just over an hour after the accident, before he had received word from the hospital of Hylton-Brown's injuries.  Trial Tr. (11/17/22 PM) at 53 (Porter). The prosecution also faulted Sutton for telling his Watch Commander that "we were following Hylton-Brown for … two minutes." *Id.* at 54; Indictment ¶ 46(c).

## B. Sutton Is Deprived of a Meaningful Defense.

### 1. *Sutton Is Prohibited from Making Any Defense that Is Unique to Police.*

Sutton asserted a law enforcement justification defense, namely, that as a police officer attempting to execute a lawful stop, his actions were authorized by law. Dkt. 188, at 1-2, 4. Sutton relied on D.C. cases recognizing a qualified law enforcement privilege to use reasonable means to affect a detention, and adopting *Graham v. Connor*'s "reasonable officer" test to determine reasonableness. *Id*. at 1-2, 4, 10, 24. The district court Sutton's denied request for a jury instruction on law enforcement privilege, Dkt. 403, at 4, and ruled that Sutton was only "permitted to assert the same defenses to second degree murder that would be available to any defendant charged under that statute," and "was not entitled to assert a defense available only to" law enforcement. Dkt. 530, at 16. In the court's view, "police officers like everyone else are subject to generally applicable laws unless there's an express exemption." *Id.* at 17; *see also* Dkt. 321, at 11; Dkt. 364 at 30.

The court also prohibited Sutton "from arguing that his conduct was justifiable or reasonable" under *Graham* or any other standard of reasonableness, Dkt. 382, at 4; Dkt. 530, at 17-18, 30, refused to instruct on the notion of a *Terry* stop, and prohibited Sutton from arguing "he was entitled to conduct a *Terry* stop." Dkt. 321, at 38.

2.      *The Prosecution Is Permitted To Rely Heavily on the General Order.*

The district court admitted the General Order, Dkt. 321, at 6-10, instructing that it could be "one factor in deciding whether the defendants had the necessary mental state." Dkt. 435, at 17. But the court did not admit or instruct on any other legal rule or standard that purported to govern when a police pursuit was authorized or justified.

3.      *The District Court Excludes Hylton-Brown's Criminal History, KDY Affiliations, and the $3,136 Taped to His Legs.*

The court refused to admit any evidence unflattering to Hylton-Brown, warning defense counsel, declaring that "[w]e're not going to engage in character assassination period." Pretrial Hr'g (10/14/22), at 27:14-24; Dkt. Nos. 343, 345, and 382, at 4, 6-7; Dkt. 306, at 6.

4.      *The Court Refuses To Instruct on Reckless Flight.*

To rebut the allegation that the "pursuit" was solely for misdemeanors, Sutton requested an instruction that reckless flight from police is a felony. Dkt. 403, at 3. The court refused, declaring "[t]hat is not coming into this trial, period. It's not coming in…. that's not what this case is about." Dkt. 306, at 48.

5.      *The Court Refuses To Instruct the Jury on the "Possible Federal Offense" Underlying the Obstruction Charges, or Allow Sutton to Argue There Was No Possible Federal Offense.*

The court ruled that Sutton "may not argue that the facts of this incident do not establish a federal civil rights violation," Trial Tr. (12/14/22 AM) at 12:4-10; *see*

*also* Dkt. 364, at 30; Dkt. 321, at 11, denied Sutton's Rule 29 motion on failure to prove the "possible Federal offense" element of the obstruction counts, Trial Tr. (11/21/22 PM), at 20-22, and refused to instruct on the nature or elements of the federal offense underlying the obstruction charges, Dkt. 403, at 4, 7; Dkt. 435, at 30-31.

## C. The Prosecution Weaponizes the Pretrial Rulings to Mislead the Jury.

### 1. *The General Order Is the Centerpiece of the Government's Case.*

The prosecution's case was based almost entirely on the General Order, which it used to claim the "pursuit" was "strictly prohibited," Trial Tr. (10/25/22 AM), at 51:20-21, "unauthorized," *id.* at 51:23, 56:23-24, and "expressly barred," *id.* (12/14/22 AM) at 30:21-25, and that Sutton believed "[t]he rules simply just didn't apply to him." *Id.* at 31:3-5; *see also id.* at 28-31, 34, 47; (12/14/22 PM), at 62-65, 73. The prosecution called a half-dozen witnesses to discuss the General Order, the training MPD officers receive on it, and to give their opinion that Sutton violated it. *See, e.g.*, (11/7/22 AM) at 38-42 (Tejera): (11/3/22 AM) at 82, 104 (Drago); (12/5/22 PM) at 33-35 (Novick); (11/15/22 AM) at 54:4-58:10 (Totaro); (11/17/22 AM), at 32:21-33:1 (Porter). The prosecution told the jury that they "know it's conscious disregard" because "you read the general orders through and through. You've seen them for the last two months." (12/14/22 PM) at 62:23-63:2. The prosecution further implied that the General Order *was* the standard of care, and even a democratically-enacted law. (12/14/22 AM) at 26:4-7; (12/14/22 PM) at 64:5-8.

2. *The Prosecution Falsely Claims that Sutton Pursued Hylton-Brown Solely for Traffic Violations.*

The prosecution told the jury: "Hylton's crime that night [was] driving a moped on a sidewalk without a helmet. For this, Sutton chased Hylton" to his death. (10/25/22 AM at 46:3-6). "The petit offense that started all of this," the prosecution continued, was "riding on the sidewalk without wearing a helmet… this was the reason … why it happened." *Id.* at 63:24-64:3. Officers Tereja and Al-Shrawi testified for the government. Tejera's understanding was that the pursuit was for traffic violations and criminal flight, (11/2/22 PM), at 54:7-14; whereas, Al-Shrawi did not know the purpose, (11/10/22 PM) at 64:11-15. Both testified that "Hylton-Brown was not suspected of any violent crime or possession of a weapon" or any other infraction besides "riding the moped without a helmet." Dkt. 526, at 33-34; Dkt. 530, at 20. Indeed, the government asked these witnesses dozens of questions seeking to demonstrate the absence of any basis to suspect Hylton-Brown of any crime or danger. *See* (11/2/22 PM) at 47:5-7, 54:23-55:3, 50-54, 56-58; (11/10/22 PM) at 44:3-45:6, 64:16-65:21, 74:19-25.

To support the false narrative that what "started all of this" was "the petit offense" of "riding on the sidewalk," (10/25/22 AM) at 63:24-64:3, the prosecution minimized what actually "started all of this": Officer Pitt's reporting. On the government's telling, Pitt was just "chatting about [her] day" when she "mentioned

in passing" that "she had seen Hylton earlier that day getting into an argument with somebody." *Id.* at 49:16-19.

### 3. *Officers Pitt and Novick Are Not Allowed To Explain Why They Suspected Hylton-Brown of Criminality.*

Officer Pitt was required to excise any context that explained why the Hylton-Brown alteration concerned her. She was not permitted to testify that the man whom Hylton-Brown nearly fought was associated with KDY. Trial Tr. (11/28/22 PM) at 54:2-16. Nor could she explain the significance of the altercation occurring at Georgia & Kennedy: i.e., that it was a KDY-controlled, open-air drug market that was not Hylton-Brown's normal corner. Rather, she could only say it was "a little weird … because [Hylton-Brown] didn't necessarily hang out over there." *Id.* at 54:17-24. Pitt was not even allowed to tell the jury the actual words she used in her report to Sutton—that she was concerned about "infighting"—because "the word 'in-fighting' is fraught with gang-related … implications." *Id.* at 61:2-25. Instead, defense counsel had to "ask her a leading question so she avoids the use of the word 'in-fighting.'" *Id.* at 61:23-25. So Pitt was simply asked to affirm that she "ha[d] concerns about what you had seen based upon your experience in PSA 403?" *Id.* at 62:10-20.

Because Pitt was not allowed to explain her concerns about Hylton-Brown, the prosecution had no problem making those concerns sound unreasonable, if not down-right discriminatory. The AUSA repeatedly asked Pitt to confirm that she

"never saw [Hylton-Brown] with a weapon," *id.* at 83:4-8, and that "the almost fight you talked about was just verbal" and "nothing actually happened," *id.* at 83:18-84:6. The court overruled Sutton's objection that the prosecution had "exploited" the court's exclusion of Hylton-Brown's criminal history to "create the impression … that there was nothing that [Pitt] knew that alarmed her." *Id.* at 96-99.

Officer Novick was forced to give a comically vague explanation for why he feared Hylton-Brown was involved in gang infighting: "from my experience in that area, there's different groups that occupy the same area… just like normal people, there are interpersonal issues that occur." *Id.* (11/29/22 PM) at 69:11-20. The prosecution repeatedly pressed Novick to falsely state that his suspicions were based solely on Pitt's reporting, asking a dozen questions like "you had no tips or anything suggesting [Hylton-Brown] had been involved in any criminal activity that day, right?" (12/1/22 PM) at 76:8-10, and "nothing other than what Officer Pitt told you indicated [Hylton-Brown] was going to be involved in a crime that night, right?," *id.* at 77:3-5; *see generally id.* at 76-80. Novick struggled to answer these questions without violating the court's order. At one point, he began to explain that "[w]e already had our preexisting knowledge…" but the court cut him off. *Id.* at 78:23-25. The prosecutor suggested Novick's concerns were "based entirely on what Officer Pitt told you" and that "You had no other information about [Hylton-Brown] that day?" *Id.* (12/2/22) at 13-15. The most Officer Novick could say to defend himself

26

was "No, just my prior knowledge." *Id.* at 13:13-14. The prosecution also asked twenty-five questions emphasizing that no one saw Hylton-Brown with a gun "that day," *Id.* at 11-12, 24-27.

The defense objected that the prosecution had opened the door for redirect questions on Hylton-Brown's association with KDY, his previous flights from police while in possession of contraband, and his three prior arrests for gun possession. *Id.* at 53-55. The court rejected the first two requests. *Id.* at 83:23-25. The court agreed, however, that "there were things [Novick] clearly was trying to avoid saying, presumably on instructions as to what I had excluded," *id.* (12/5/22 AM), at 5:15-20, and found the prosecution turned the pre-trial rulings "into something of a sword." *Id.* at 5:21-25, 8:11-19. Accordingly, the defense was permitted "a very limited redirect examination" on Novick's "knowledge of Hylton-Brown's history of arrest for weapons." *Id.* at 8:5-8. This redirect consisted of leading questions, in which Novick was permitted to affirm that he "was aware that [Hylton-Brown] had been arrested in the past for possession of a handgun," and that "was a factor that definitely played into the totality of the circumstances." *Id.* at 18:20-19:4.

In closing, the prosecution asserted that Hylton-Brown "wasn't committing a crime, let alone a violent one. He wasn't doing a damn thing wrong that night." *Id.* (12/14/22 PM) at 72:6-8. The prosecution supported that claim by pointing to what the CST witnesses did not say (and could not say because of the pretrial rulings):

"the three officers who took that stand … And we asked … each one of them through and through, What did you see? What did you hear? Did you think that there was a crime? Give me something. Nothing. Zero." *Id.* at 72:8-13. Incredibly, the prosecutor then asserted that—in the prosecutor's opinion—Novick and Pitt's concerns were fabricated, stating "***I am not … fully crediting***" their testimony. *Id.* at 72:19-21. The prosecution further claimed that "Sutton at best had, a hunch" that Hylton-Brown was involved in crime, *id.* at 60:2-5, which was solely based on "that Hylton-Brown got into an argument earlier that day." *Id.* at 72:19-73:1.

        4.    *The Prosecution Suggests—Without Evidence—That Sutton Had Nefarious Motives.*

The prosecution then denied that Sutton "truly did believe this was about some violent possibility with Hylton-Brown," *id.* at 73:15-17, suggesting instead that Sutton stopped Hylton-Brown "for simply minding [his] own business," *id.* at 64:3-5, and that Hylton-Brown "could have sneezed at that corner, and [Sutton] still would have pursued him." *Id.* at 80:13-15; *see also id.* at 73:2-13, 79:14-25.

        5.    *The Prosecution Falsely Claims that Sutton Was Charged With "Covering Up" a Murder.*

The prosecution repeatedly implied the obstruction charges were premised on "covering up" the charged murder. *See, e.g.*, (10/25/22 AM) at 47:5-8, 20-21, 64:10-11, 65:6-13, (12/14/22 PM at 47:17-48:25). Still, the court refused Sutton's

requested curative instruction that "murder in the second degree is not a federal offense." Dkt. 403, at 7.

## IV. Conviction

Sutton was convicted and sentenced to sixty-six and forty-eight months for the murder and obstruction counts, respectively. The court granted bail pending appeal, finding there were "clearly … substantial questions on appeal," *id.* Dkt. 678, at 102-03.

## Standard of Review

 "A claim that the court improperly omitted an instruction is reviewed de novo." *United States v. McGill*, 815 F.3d 846, 888 (D.C. Cir. 2016). Evidentiary rulings are reviewed for abuse of discretion. *Muldrow v. Re-Direct*, 493 F.3d 160 (D.C. Cir. 2007). "A district court by definition abuses its discretion when it makes an error of law." *Shatsky v. PLO*, 955 F.3d 1016, 1031 (D.C. 2020). When applying D.C. law, this Court "follow[s] the decisions of the D.C. Court of Appeals." *Rogers v. Ingersoll-Rand Co.*, 144 F.3d 841, 843 (D.C. Cir. 1998).

## Summary of Argument

This case does not rise to depraved heart murder, which requires conduct that manifests a wanton disregard for the value of human life, such as "firing a bullet into an [occupied] room," "starting a fire at the front door of an occupied dwelling;" or "playing a game of 'Russian roulette'" *Comber v. United States*, 584 A.2d 26, 39 n.13 (D.C. 1990). The evidence showed, at most, a violation of an internal policy

that the prosecution's own expert admitted was among the country's "more restrictive." In other words, whether police should pursue those who flee lawful stops is a debatable question of public policy upon which police departments differ. That alone puts such pursuits in a different category from firing a bullet into an occupied room.

The district court further erred by prohibiting Sutton from raising a law enforcement privilege defense. At common law, "an intentional killing was 'justifiable,' and thus no crime, if it was 'commanded or authorized by law.'" *Comber*, 584 A.2d at n.16. And D.C. courts have repeatedly recognized that police have a common law immunity when using reasonable means to affect a lawful arrest. The district court nonetheless refused to instruct the jury on this defense because it wrongly believed that D.C. does not recognize common law defenses. Dkt. 530, at 17. The court's retroactive abrogation of law enforcement privilege violated due process, and would mean that D.C. police commit assault, battery, and kidnapping every time they make an arrest.

Nor was Sutton given a meaningful opportunity to show that he complied with the General Order. The jury was not instructed on the concept of a *Terry* stop, which would have supported Sutton's defense that "the pursuit" was primarily to affect a *Terry* stop and not "for the purpose of affecting a stop for a traffic violation." Indictment ¶ 8. Nor was the jury instructed that reckless flight from police is a felony,

which would have allowed Sutton to counter the government's claim that he violated the General Order by chasing Hylton-Brown over a misdemeanor. Most egregiously, the district court excluded Hylton-Brown's criminal history and KDY-affiliation, and Officer Pitt's statement that she believed the Hylton-Brown was involved in KDY "infighting." This critical context would have shown that Sutton was motivated by CST's core reason for being stationed on Kennedy Street in the first place: to stop gang violence before it starts.

The obstruction convictions must be reversed because the charged statutes require obstruction of "information relating to the commission or possible commission of a Federal offense," 18 U.S.C. § 1503, whereas, Supreme Court precedent foreclosed the possibility that the pursuit could constitute a federal civil rights offense. The prosecution tried to meet this element by simply stating that there was a "federal civil rights *investigation*," without specifying what federal civil rights crimes were investigated or why those crimes may have occurred. Worse, Sutton was precluded from meaningfully contesting the "possible federal offense" element because the court refused to instruct on the nature or elements of the federal civil right crimes at issue, and forbade Sutton from "argu[ing] that the facts of this incident do not establish a federal civil rights violation." Trial Tr. (12/14/22 AM), at 12:4-10. The prosecution filled this instructional void by falsely suggesting that Sutton was charged with obstructing an investigation into the alleged murder.

<u>**Argument**</u>

**I.      The Evidence Was Insufficient to Support a Murder Conviction.**

Second degree murder is a killing committed "with malice aforethought." DC.

CODE § 22-2103. "Malice aforethought" is not defined by D.C. statute; rather, D.C.

follows "the generally recognized common law understanding" of the term. *Comber*,

584 A.2d at 44, 47. Here, the prosecution charged a type of "malicious killing"

known as "depraved heart murder," which occurs "only where the perpetrator was

subjectively aware that his or her conduct created an extreme risk of death," and

"where conduct is reckless and wanton, and a gross deviation from a reasonable

standard of care." *Id.* at 39.

D.C.'s standard for proving depraved heart murder is "exacting." *Williams v.*

*United States*, 314 A.3d 1158, 1185 (D.C. 2024). It requires conduct that is "not only

an unjustifiable but also [creates] a very high degree of risk of death." *Comber*, 584

A.2d at 39 & n.11 (citation omitted). "Examples of conduct rising to the level of

depraved heart malice" include "firing a bullet into a room occupied … by several

people; starting a fire at the front door of an occupied dwelling; shooting into … a

moving automobile …; playing a game of Russian roulette with another person …;

[and] selling pure (i.e., undiluted) heroin." *Id.* at 39 n.13 (quotations omitted); *see*

*also Jennings v. United States*, 993 A.2d 1077, 1081 (D.C. 2010) (firing ten bullets

into a crowd); *Coleman v. United States*, 948 A.2d 534, 550-551 (D.C. 2008)

(handing gun to an accomplice); *Powell v. United States*, 485 A.2d 596, 597-598 (D.C. 1984) (fleeing from a traffic stop "in excess of ninety miles per hour"). By contrast, courts reverse depraved heart murder convictions where risk, while high, is not extreme. *See, e.g., People v Maldonado*, 18 N.E.3d 391, 395-96 (N.Y. 2014) (drunk and "unquestionably reckless" driving insufficient); *Commonwealth v. Ludwig*, 874 A.2d 623, 633 (Pa. 2005) (selling a double dose of Ecstasy to a child insufficient). As one court explained, "[t]he word 'wanton' is the key" because it denotes "an element of viciousness" that exists where someone "shoots into a house or train 'just for kicks'" but not where one "attempts to pass another car on a 'blind curve.'" *Blackwell v. Maryland*, 369 A.2d 153, 158 (Md. 1976).

No reasonable juror could find beyond a reasonable doubt that Sutton's low-speed driving satisfies this "exacting" standard. *Williams*, 314 A.3d at 1185. In stark contrast to sadistic acts like firing into a crowded room, courts have recognized the "difficulties" of "weighing the conflicting factors involved" in "high-speed police chases." *See D.C. v. Walker*, 689 A.2d 40, 49 n.19 (D.C. 1997) (collecting cases). Officers "must make a split-second decision" that balances the risks "attendant upon the officer's decision to pursue" against the risks involved in a "decision not to pursue," *Boyer v. State*, 594 A.2d 121, 137 (Md. Ct. App. 1991), and must balance "obligations that tend to tug against each other." *County of Sacramento v. Lewis*, 523 U.S. 833, 853 (1998). Even an officer who gets this calculus wrong does not act

more wantonly than a drunk driver, *see Blackwell*, 369 A.2d at 158, or a trafficker of Ecstasy to children, *see Ludwig*, 874 A.2d at 633.

Officer Sutton's conduct would not even satisfy D.C.'s standard for civil liability in police pursuit cases, which requires proof of "gross negligence." *Walker*, 689 A.2d at 43. To assess "gross negligence," D.C. courts use "the standard of care which must be breached … for simple negligence" as a "base point from which the magnitude of deviation can be assessed." *Walker*, 689 A.2d at 45. "[T]he national standard of care requires the police, in deciding whether to initiate and continue a pursuit, to weigh the urgency of making an immediate apprehension … against the foreseeable risk[s]." *Id.* (quotations omitted); *accord D.C. v. Hawkins*, 782 A.2d 293, 299 (D.C. 2001); *Duggan v. D.C.*, 783 A.2d 563, 566 (D.C. 2001).

"[V]irtually all appellate opinions addressing vehicular police pursuits of suspected law violators that ended in collisions between the pursued vehicles and vehicles of third parties hold as a matter of law that the police conduct … did not constitute gross negligence." *Walker*, 689 A.2d at 48-49 & n.19 (first citing, with approval, *Boyer v. Maryland*, 594 A.2d 121, 124 (Md. Ct. App. 1991) (100-mph chase of drunk driver through heavy traffic without siren not gross negligence); then citing *Peak v. Ratliff*, 408 S.E.2d 300, at 308-10 (W. Va. 1991) (100-mph chase of burglary suspect through partly residential area not gross negligence); then citing *Fowler v. North Carolina*, 376 S.E.2d 11 (N.C. Ct. App. 1989) (115-mph, 8-mile

chase of speeding suspect on two-lane highway, without sirens or emergency lights, not gross negligence); then citing *Bullins v. Schmidt*, 369 S.E.2d 601 (N.C. 1988) (100-mph, 18-mile chase of suspected drunk driver not gross negligence).

In *Walker*, for instance, the police chased a juvenile suspected of car theft over 5 miles while the juvenile drove 50 in a 35, ran red lights, hopped curbs, drove the wrong way down a one-way street, sporadically lost control of the vehicle, and ultimately, caused a fatal head-on collision. 689 A.2d at 43. Still, the D.C. Court of Appeals reversed the jury's gross-negligence finding because no "reasonable juror could find … an extreme deviation from the reasonable standard of care" or that the risk "so great as to support a finding that the officers acted with wanton, willful and reckless disregard." *Id.*; *see also D.C. v. Henderson*, 710 A.2d 874, 875-77 (D.C. 1998) (no reasonable juror could find gross negligence where officer drove 10 mph over the speed limit, ran a redlight, and struck and killed a motorist).

The D.C. Court of Appeals has allowed civil police pursuit cases to go to a jury in only the most extreme cases. *See Tillery v. D.C.*, 227 A.3d 147, 153 (D.C. 2020) (officer "knowingly drove in great excess of the speed limit through a stop sign, without his siren or emergency lights activated, after seeing another motorist approaching the intersection before him, in an area where his visibility to that other motorist was obstructed, and without any real need or justification for doing so"); *Hawkins*, 782 A.2d at 297-98, 300-01 (police chased suspect at 83 to 90 mph through

a densely populated residential area, during rush hour, near schools and daycares, and "knew[] the roadway … had a crest which obstructed the view of what was on the other side of the hill" where the accident occurred); *Duggan*, 783 A.2d at 566, 569-70 (police pursued a 13-year-old driver "at least" 30 mph over the speed limit, near schools, during "a busy time of day," when "the roads were wet and slippery" and when "seven teenagers were present at the intersection where the collision occurred"); *D.C. v. Chambers*, 965 A.2d 5, 7-9 (D.C. 2009) (officer chased vehicle at 50-80 mph through populated streets for an "expired temporary tag").

The pursuit here posed a lower risk than in the civil cases discussed above. Whereas those cases all involved high-speed chases, Hylton-Brown was driving a scooter incapable of exceeding 30 mph. And, in contrast to chases that occurred in busy neighborhoods during rush hour, *see Hawkins*, 782 A.2d at 300, or near schools when children were being dismissed, *see Duggan*, 783 A.2d at 569-70, this occurred after 10pm. The length of the "pursuit" was just four blocks, compared to five to eighteen miles in *Walker*, *Boyer*, and *Bullins*. Nor were there dangerous road conditions as in *Henderson*, *Hawkins*, and *Duggan*.[3]

---

[3] The one time that Sutton exceeded 40 mph occurred at 10:10:41pm—50 seconds before the accident. *See* Sutton Exs. 800kk & 100I. And Sutton did not exceed 30 mph for the last 37 seconds. *Id.* The one time Sutton followed Hylton-Brown the wrong down a one-way street (i.e., westbound on Jefferson Street) ended at 10:10:47—44 seconds before the accident. *Id.* Because those events could not plausibly be considered the proximate cause of the accident, they cannot be evidence of a breach of the standard of care. *See Walker*, 689 A.2d at 46 ("[I]n deciding

Moreover, there was a strong "need to apprehend" Hylton-Brown. *Walker*, 689 A.2d at 46. Police observed him run red lights and stop signs, drive on the sidewalk, and cut in front of oncoming traffic. This reckless driving started the moment Hylton-Brown was approached—***before*** any pursuit began—and Pitt observed similar conduct hours earlier. Hylton-Brown's driving thus posed an immediate danger that would likely have persisted even if Sutton let him go. *See Scott v. Harris*, 550 U.S. 372, 385 (2007) (rejecting flawed logic that ceasing pursuit of a reckless driver would abate the threat). More importantly, Hylton-Brown was a suspected gang member with a history of violence who ***that day*** tried to fight another suspected gang member on a known drug corner; appeared to be "looking for someone"; and was known to flee police only when in possession of guns or drugs. The "need to apprehend" Hylton-Brown thus exceeded that in civil cases holding no gross negligence. *See, e.g.*, *Walker*, 689 A.2d at 49 (driving stolen car); *Banks*, 646 A.2d at 974 (same); *Boyer*, 594 A.2d at 132 ("suspected intoxicated driver"); *Peak*,

---

whether the conduct of the MPD officers could be found to constitute gross negligence, we necessarily focus … on … where the collision took place. Even assuming … the officers were grossly negligent at an earlier point in the pursuit … , such gross negligence did not in itself cause any injury."). Indeed, under the prosecution's theory, "Sutton's driving decisions ***in the final 30 seconds*** of this chase killed Hylton-Brown." Trial Tr. (12/14/22 AM) at 25:19-31 (emphasis added). In those final 30 seconds, Sutton was driving less than 26 mph. *Id.* (11/2/22 PM) at 88:21-89:10 (Tejera).

408 S.E.2d at 308-10 (suspected burglary); *Fowler*, 376 S.E.2d at 12 (speeding); *Saarinen*, 644 N.E.2d at 989 (running stop sign).

Nor can the prosecution prove recklessness by claiming that the "pursuit" was "'for the purpose of affecting a stop for a traffic violation.'" Indictment ¶ 8 (quoting General Order 301.03). General Order 301.03 is "an internal operating manual" whose violation is insufficient to support a "finding of negligence, let alone gross negligence." *Walker*, 689 A.2d at 47 n.13 (first quoting *Abney v. D.C.*, 580 A.2d 1036, 1041 (D.C. 1990); and then quoting *Banks*, 646 A.2d at 983 (Farrell, J., concurring)); *Henderson*, 710 A.2d at 876-877 (violation of General Order 301.03 "cannot … support the kind of finding *Walker* requires for gross negligence"); *see also State v. Pagotto*, 762 A.2d 97, 109-112 (Md. 2000) ("[A]lleged violations of departmental guidelines, at best, amounted to an actionable case in civil negligence."). Nor could violation of General Order 301.3 show a gross deviation from the "national standard of care," *Walker*, 689 A.2d at 47 n.13, because the prosecution's own expert admitted that the General Order was "more restrictive" than the national norm for pursuit policies. Trial Tr. (11/3/22 AM) at 94:10-16; *see Pagotto*, 762 A.2d at 109 (reversing conviction based on violation of "a geographically unique guideline"). Regardless, the idea that a traffic violation was Sutton's primary motivation conflicts with the undisputed timeline: Lieutenant Zabavsky ordered four CST officers to find Hylton-Brown just "seconds" after

hearing Pitt's reporting and **before** they witnessed any traffic violation. Trial Tr. (11/10/22 PM) at 45:21-24 (Al-Shrawi).

## II. The District Court Erred by Denying Officer Sutton a Law Enforcement Privilege Defense.

### A. D.C.'s Murder Statute Incorporates Common Law Defenses.

D.C.'s murder statute "merely codif[ied] the common law definition of murder." *Comber*, 584 A.2d at 38 n.9. In determining the meaning of "malice aforethought," D.C. courts are "bound by Maryland common law in effect as of 1801 (incorporating English common law and statutes in effect as of 1776) unless expressly repealed or modified by statute." *Williams v. United States*, 569 A.2d 97, 99 (D.C. 1989). Congress's codification of D.C. law "did not abrogate or alter any feature of murder at common law in the absence of an express" statement to the contrary. *United States v. Jackson*, 528 A.2d 1211, 1215 (D.C. 1987) (quotations omitted); *accord Byrd v. United States*, 500 A.2d 1376, 1385 (D.C. 1985).

"Malice aforethought" under D.C. Code § 22-2103 "imports the absence of all elements of justification, excuse or recognized mitigation." *Thomas v. United States*, 557 A.2d 1296, 1299 (D.C. 1989); *see also Comber*, 584 A.2d at 30-31. The nature and scope of justification defenses recognized by D.C. law are governed by the common law. *See United States v. Peterson*, 483 F.2d 1222, 1228-29 & n.36 (D.C. Cir. 1973); *Comber*, 584 A.2d at 48. Indeed, the D.C. Court of Appeals frequently recognizes common law defenses to criminal statutes. *See, e.g.*, *Newby v.*

*United States*, 797 A.2d 1233, 1241-1245 (D.C. 2002) ("the parental discipline …

remains a common law defense"); *Jones v. United States*, 172 A.3d 888, 891 (D.C.

2017) (recognizing "the common-law defense-of-property doctrine"). The district

court erred in holding that Sutton could only assert defenses that were expressly

stated in the D.C. code. *See* Dkt. 530, at 17, 24; Dkt. 321, at 11; Dkt. 364 at 30.

## B. The Common Law Recognized a Law Enforcement Authority Defense.

"At early common law, an intentional killing was 'justifiable,' and thus no

crime, if it was 'commanded or authorized by law.'" *Comber*, 584 A.2d at n.16; *see*

*also Mullaney v. Wilbur*, 421 U.S. 684, 692 (1975). Today, "[e]very American

jurisdiction recognizes some form of law enforcement authority justification." 2 Paul

H. Robinson, *Criminal Law Defense* § 142 (2023); *see also* M.P.C. § 303; *Riley v.*

*State*, 133 A.3d 1219, 1224-25 (Md. 2016) ("Riley was entitled to raise the

affirmative defense of law-enforcement justification"); *Ohio v. White*, 29 N.E.3d

939, 944 (Oh. 2015) ("At common law,… [i]n making arrests for  felonies and

misdemeanors, an officer could use whatever force was reasonably necessary" and

"did not face criminal liability") (collecting authorities); Wayne LaFave, 2

*Substantive Criminal Law* § 10.7 (2023).

D.C. is no exception. "At common law, 'a police officer has a qualified

privilege to use reasonable force to affect an arrest, provided that the means

employed are not in excess of those which the actor reasonably believes to be

40

necessary.'" *Johnson v. D.C.*, 490 F. Supp. 3d 144, 168 (D.D.C. 2020) (quoting *Etheredge v. D.C.*, 635 A.2d 908, 916 (D.C. 1993)); *accord Scales v. D.C.*, 973 A.2d 722, 730 (D.C. 2009); *Jackson v. D.C.*, 412 A.2d 948, 956 (D.C. 1980); *Tinius v. Choi*, 77 F.4th 691, 706 (D.C. Cir. 2023).

D.C courts routinely apply law enforcement privilege when police are sued for assault. *See, e.g.*, *Jackson*, 412 A.2d at 956; *Etheredge*, 635 A.2d at 916-17; *Rogala v. D.C.*, 161 F.3d 44, 57 (D.C. Cir. 1998) ("In the course of making a lawful arrest, a police officer is privileged to use [reasonable] force."); *Bushrod v. D.C.*, 521 F. Supp. 3d 1, 29-30 (D.D.C. 2021). The D.C. Court of Appeals has never suggested that the privilege is limited to civil cases and such a limit would lead to the absurd result that D.C. officers commit numerous crimes every time they make an arrest. *See D.C. v. Chinn*, 839 A.2d 701, 706 (D.C. 2003).

## C. D.C. Looks to Fourth Amendment Cases To Determine Common Law Reasonableness.

In determining the scope of law enforcement privilege, the D.C. Court of Appeals has adopted the "objective reasonableness" test of *Graham v. Conner*, which provides that "'the reasonableness of a particular use of force must be judged from the perspective of a reasonable officer on the scene.'" *Etheredge*, 635 A.2d at 916 (quoting *Graham v. Connor*, 490 U.S. 386, 396-97 (1989)); *see also Rogala*, 161 F.3d at 57 (recognizing that *Etheredge* adopted *Graham's* "reasonable officer" test). While "there are differences between a federal constitutional claim and a tort

suit brought under D.C. law," *Etheredge* deemed *Graham* an appropriate guide because it "reflects a realistic recognition of the perils of police work," which do "not turn on the forum in which the plaintiff subsequently seeks redress or on the legal authorities on which he relies." *Etheredge*, 635 A.2d at 916 n.10. Like the *Graham* test, "the test for qualified privilege" asks whether "the officer's judgment is [reasonable] compared to that of a hypothetical reasonable police officer placed in the same situation." *Scales*, 973 A.2d at 730.

Thus, "D.C. courts use the same objective reasonableness standard applicable to qualified immunity under § 1983" when "evaluat[ing] whether qualified privilege applies," *Bushrod*, 521 F. Supp. 3d at 29-30 (quotations omitted), and dismiss assault claims if the officer's conduct was reasonable under Fourth Amendment precedent. *See, e.g.*, *Rogala*, 161 F.3d at 57; *Jenkins v. D.C.*, 223 A.3d 884, 900 (D.C. 2020); *Evans-Reid*, 930 A.2d at 945 n.23; *Bushrod*, 521 F. Supp. 3d at 46-47.

### D.  No Reasonable Jury Could Find that Sutton's Attempted Apprehensive Was Not Authorized by Law.

"Once the issue of … justification … is in the case, the government must prove its absence beyond a reasonable doubt in order to show malice." *Logan v. United States*, 483 A.2d 664, 672 (D.C. 1984); *see also Comber*, 584 A.2d at 41-42 & n.18. The prosecution failed to do so.

42

### 1. Sutton Was Authorized To Detain Hylton-Brown.

"A law enforcement officer may arrest, without a warrant … a person who he has probable cause to believe has committed … an offense in his presence." D.C. Code § 23–581(a)(1)(B); *see also Atwater v. City of Lago Vista*, 532 U.S. 318, 344 (2001) ("[A]ll 50 States and the D.C. permit warrantless misdemeanor arrests…."). In addition, "members of the police force … possess … all the common-law powers of constables," D.C. Code § 5–127.04.3, and "the usual rule at common law was that a police officer could arrest without warrant one guilty of a misdemeanor if committed in his presence," *Atwater*, 532 U.S. at 329. Since Hylton-Brown committed multiple, reckless traffic violations in Sutton's presence, there is no question that an arrest was authorized by D.C. law.

Sutton was also authorized to conduct a *Terry* stop, which simply requires "reasonable, articulable suspicion that criminal activity is afoot." *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000). Sutton encountered Hylton-Brown at night in a high crime area. *See United States v. Edmonds*, 240 F.3d 55, 60 (D.C. Cir. 2001). Sutton knew Hylton-Brown was associated with a violent gang and had multiple prior arrests. *See United States v. Castle*, 825 F.3d 625, 629 (D.C. Cir. 2016); *United States v. Guardado*, 699 F.3d 1220, 1224 (10th Cir. 2012). And a fellow officer told Officer Sutton that Hylton-Brown had an altercation with a known gang member on a known drug corner earlier that day; that the altercation was indicative of gang

"infighting," that, in her judgment, there would have been a physical fight had police not been present; and that Hylton-Brown returned to the area and appeared to be "looking for somebody." Pretrial Hr'g (10/17/22) at 67:17-19.

Hylton-Brown's flight also justified both a *Terry* stop and an arrest. The Supreme Court has repeated the "unremarkable observation" that "'headlong flight'" supports reasonable suspicion. *Kansas v. Glover*, 589 U.S. 376, 383 (2020). Indeed, flight in a high-crime area is alone sufficient for reasonable suspicion. *See Wardlow*, 528 U.S. at 124; *Edmonds*, 240 F.3d at 60; *United States v. Dykes*, 406 F.3d 717, 720 (D.C. Cir. 2005) ("There is no question but that the officers had reasonable suspicion … to conduct a *Terry* stop where a person fled without provocation upon seeing police enter an area known for heavy narcotics trafficking.") (quotations omitted). Hylton-Brown's flight was especially suspicious because he was known to only flee when in possession of guns or drugs.

2. *Officer Sutton Used Reasonable Means To Attempt a Detention.*

Authorization to detain carries with it "a qualified privilege to use reasonable force." *Etheredge*, 635 A.2d at 916; *accord Tinius*, 77 F.4th at 706. Where police pursue a fleeing suspect but do not make physical contact, they have not used force at all, much less unreasonable force. *See Lewis*, 523 U.S. at 843-844; *United States v. Pope*, 313 A.3d 565, 572 (D.C. 2024).

Regardless, any use of force was here reasonable under *Graham* and *Etheredge*, which balance risks against "countervailing governmental interests." *Graham*, 490 U.S. at 396. In pursuit cases, those government interests include "show[ing] that flight from the law is no way to freedom." *Lewis*, 523 U.S. at 854-55; *see also Scott*, 550 U.S. at 385 ("requiring the police to allow fleeing suspects to get away whenever they drive so recklessly that they put other people's lives in danger … would create … obvious … perverse incentives").

Here, there was a strong government interest in apprehending Hylton-Brown due to his reckless driving and suspected involvement in ongoing, gang-related violence, and any marginal risk that the attempted apprehension added to Hylton-Brown's already-reckless driving was minimal. Indeed, the prosecution did not even attempt to prove that Sutton acted "unreasonable" under *Graham* or any other standard, arguing instead that "this idea of reasonability doesn't really apply." Trial Tr. (11/21/22 PM), at 51:24-52:7.

> 3. *An Alleged Violation of an Internal Rule Cannot Render a Police Action Unauthorized for the Purposes of Common Law Privilege.*

MPD General Orders "do not have the force or effect of a statute or an administrative regulation." *Abney*, 580 A.2d at 1041. They cannot reduce the legal authority of MPD officers, who enjoy "all the common-law powers of constables," D.C. Code § 5–127.04, including a qualified privilege to use reasonable means to

effect detentions, *see supra* Sections II.B; *see also Byrd*, 500 A.2d at 1385 ("common law as it existed in Maryland in 1801 continue[s] in force unless repealed or modified *by statute*") (emphasis added).

Nor do the means taken to attempt a seizure become "unreasonable" if they violate an internal police rule. The Supreme Court has refused to consider local police rules in determining Fourth Amendment reasonableness because they "vary from place to place and from time to time," and could make the legality of police conduct turn on the "trivialities." *Whren v. United States*, 517 U.S. 806, 815 (1996). But the prosecution's theory would make the legality of a pursuit hinge on distinctions, such as whether Sutton was subjectively motivated by a desire to enforce traffic laws, and whether the suspected crimes constituted felonies, which Fourth Amendment jurisprudence has long rejected as irrelevant and unworkable. *Id.* 517 U.S. at 813 (officer's subjective intent irrelevant); *Garner*, 471 U.S. at 11-12 ("reasonableness" should not turn on whether suspected crime is a felony because the "distinction is minor and often arbitrary" and "difficult to apply in the field").

### E. The District Court Erred by Refusing a Law Enforcement Privilege Instruction.

Sutton's requested instructions closely-tracked D.C.'s qualified privilege." Dkt. 403, at 4. But the district court refused to give an instruction on this defense or any other "defense available only to" law enforcement. Dkt. 530, at 16. This error

was not harmless given the overwhelming evidence that Sutton's actions were authorized, *see supra* Section II.D.

## III. The District Court Erred in Instructing the Jury.

### A. The District Court Failed To Instruct on the "Reasonable Officer" Standard.

Even if D.C. did not recognize law enforcement privilege, the jury still should have been instructed that, in assessing recklessness, it must measure Sutton's conduct against that of a reasonable police officer balancing risk against need. Dkt. 403, at 4; *Pagotto*, 762 A.2d at 108 (in criminal gross negligence case, "the reasonableness of the conduct must be evaluated not from the perspective of a reasonable civilian but rather from the perspective of a reasonable police officer"). Even in civil police pursuit cases, the jury must "weigh the urgency of making an immediate apprehension … against the foreseeable risk." *Walker*, 689 A.2d at 43.

Under the jury instructions, however, whether the danger of the "pursuit" was justified by law enforcement need was irrelevant. The only thing that mattered was the level of risk, i.e., whether it amounted to "an extreme risk." Dkt. 435, at 27. That was by design since, in the court's view, Sutton "was not entitled to assert a defense available only to" law enforcement. Dkt. 530, at 16.

### B. The District Court Erred By Making the General Order the Only Justification Standard the Jury Could Hear.

Based on the district court's ruling that the jury could not consider whether the "pursuit" was justified by law enforcement need, the General Order should have

47

been excluded. After all, the portion of the General Order upon which the prosecution principally relied, Dkt. 1 ¶ 8, regulated law enforcement justification, not safety or level of risk. Pursuing a felon is just as dangerous as pursing a traffic violator, perhaps more dangerous. The General Order simply represents the police chief's judgment that the risk of a pursuit is ***justified*** by law enforcement need in the former case but not the latter. It was fundamentally unfair to deny Sutton a law enforcement justification defense, and require he be treated as a private citizen, but still allow the prosecution to use rules that only apply to police in order to show ***the absence*** of any law enforcement justification.

To be sure, "evidence that the police violated the general order was one factor that the jury could consider," but only so long as the court made clear that "liability would attach only if the MPD officers were grossly negligent ***with reference to the national standard of care*** … *i.e.*, whether the need to apprehend the [suspect] was outweighed by the foreseeable hazards." *Walker*, 689 A.2d at 46 & n.13; *see also Tillery,* 227 A.3d at 152 n.17 ("A violation of an MPD General Order … 'is a factor the jury can consider in determining whether the officer was grossly negligent ***in departing from the standard of care***.'" (quoting *Duggan*, 783 A.2d at 570) (emphasis added)). Here, the district court instructed the jury that a violation of the General Order was "one factor in deciding whether the defendants had the necessary mental state." Dkt. 435, at 17. But, under the court's instructions, the relevant

"necessary mental state" was about the level of risk, not whether the risk was justified by law enforcement need. *See supra* Section III.A. The jury charge made no reference to "the national standard of care," *Walker*, 689 A.2d at 47 n.13, and Sutton was prohibited from offering an alternative standard of care based on his training on *Graham's* "reasonable officer" test, *see infra* Section V. The jury was left with the impression that, to the extent that law enforcement justification was relevant at all, it was governed by the General Order—an impression the prosecution encouraged. *See* SOC, III(C)(2).

### C. The District Court Erred by Refusing to Instruct the Jury on *Terry* Stops.

Assuming *arguendo* that there is no law enforcement privilege defense, the court's refusal to instruct on *Terry* or to allow Sutton to argue he was conducting a *Terry* stop, Dkt. 530, at 31, would still be prejudicial error because it undermined Sutton's ability to argue that he complied with "the national standard of care" which requires an assessment of the "the need to apprehend" the suspect. *Walker*, 689 A.2d at 43. Sutton was entitled to argue that "the need to apprehend" Hylton-Brown included, not just the need to enforce traffic laws, but also the need to affect a *Terry* stop based on suspicion of more serious criminality. A *Terry* instruction was also needed to rebut the prosecution's central claim: that Sutton pursued Hylton-Brown solely "'for the purpose of enforcing traffic violation,'" Indictment ¶ 8 (quoting General Order 301.3). Sutton was entitled to counter that false dichotomy by

showing that his primary purpose of the pursuit was to conduct a *Terry* stop, which is permissible upon "reasonable suspicion" that Hylton-Brown had committed ***or was about to commit*** a crime. *See supra Section* II.D.1; Dkt. 403, 4-5. Without a *Terry* instruction, the jury was likely to believe the prosecution's false assertion that "reasonable suspicion … does not matter" because "there also needs to be probable cause" 12/14/22 AM at 29:13-17.

> ### D. The District Court Failed To Instruct the Jury that Reckless Flight Is a Felony.

Sutton asked that the jury be instruction that, under D.C. law reckless flight from law enforcement is a felony. *See* D.C. Code § 50-2201.05b(b). This instruction was necessary, inter alia, to show compliance with the General Order, which the prosecution insisted only authorizes pursuits where there is probable cause of a felony. Trial Tr. (12/14/22 AM) at 29:13-17.[4] The district court denied this instruction because "the evidence is equivocal about whether Hylton-Brown was driving recklessly." Pretrial Hr'g (10/24/22 PM) at 25:25-27:5.

That finding was clearly erroneous. For starters, there was overwhelming evidence of reckless driving. *See also supra* SOC, Section II.E. Regardless, to comply with the prosecution's interpretation of the General Order, Sutton only

---

[4] The General Order does not actually state such a requirement, and a murder conviction cannot be premised on violating the "spirit" of a police chief's order. *See Whitman v. United States*, 574 U.S. 1003, 1004-05 (2014) (rule of lenity applies to administrative orders "to which criminal prohibitions are attached").

needed probable cause of a felony, not certainty. And a defense theory need not be ironclad; it would be enough if a reasonable juror *could* find probable cause of reckless driving. *See Hurt*, 527 F.3d at 1351.

The district court "ultimately declined to provide the requested instructions because the issue of whether a person violates the D.C. Code flight statute is very fact intensive." Dkt. 530, at 32. If the jury truly could not comprehend how the D.C. Code separates misdemeanors from felonies, the court should have precluded the prosecution from centering its case on an internal rule that purportedly turns on whether there is probable cause of a felony. Indeed, the Supreme Court refused to premise the legality of police conduct on local police rules precisely because they often turn on arbitrary and difficult-to-apply distinctions. *See supra*, Section II.D.iii. Having rejected those cases and allowed the prosecution to premise murder liability on a local rule, the district court cannot preclude the defendant from showing he complied with that rule on the grounds that it would be "too fact intensive."

This instruction failure was especially prejudicial because the prosecution weaponized it by repeatedly eliciting misleading testimony that fleeing from police was merely a misdemeanor. *See* Trial Tr. (11/2/22 PM), at 54:14-19, 61:7-10 (Tejera). When the defense sought to clarify that fleeing police "in a reckless manner is a felony," the prosecution successfully objected. *Id.* (11/4/22 AM) at 74:12-19. The prosecution even sponsored expert testimony that, if the subjects of a traffic stop

"want to flee, if they want to not be stopped by police, they have the right to do so." *Id.* (11/15/22 PM) at 57:15-18.

## IV. The District Court Erred By Excluding Hylton-Brown's Criminal History and Gang Membership.

### A. Reverse-404(b) Evidence Is Subject to a Lower Standard.

While prior crimes evidence "almost unavoidably raises the danger that the jury will improperly 'conclude that because [defendant] committed some other crime, he must have committed the one charged," this risk "cannot give rise to a *per se* rule of exclusion" and should only result in exclusion where there is "compelling or unique evidence of prejudice." *United States v. Douglas*, 482 F.3d 591, 601 (D.C. Cir. 2007)). This Court has repeatedly held that a limiting instruction is sufficient to protect defendants from the inherent prejudice of criminal history evidence. *See, e.g.*, *United States v. McCarson*, 527 F.3d 170, 173-74 (D.C. Cir. 2008); *Douglas*, 482 F.3d at 601; *United States v. Cassell*, 292 F.3d 788, 791-92 (D.C. Cir. 2002).

Courts apply an even more inclusionary standard to "reverse-404(b)" evidence. *See United States v. Stevens,* 935 F.2d 1380, 1404 (3d Cir. 1991); *United States v. Seals*, 419 F.3d 600, 607 (7th Cir. 2005); *United States v. Aboumoussallem*, 726 F.2d 906, 911-13 (2d Cir. 1984). This is because "risks of prejudice are normally absent when the defendant offers [bad] acts evidence of a third party." *Aboumoussallem*, 726 F.2d at 911; *accord United States v. Krezdorn*, 639 F.2d 1327, 1332-33 (5th Cir. 1981); *United States v. Murray*, 474 F.3d 938, 939-41 (7th Cir.

2007). Conversely, the right to admit exculpatory evidence is central to the Fifth and Sixth Amendments. *See Pennsylvania v. Ritchie*, 480 U.S. 39, 56 (1987). And Rule 404 itself recognizes that a defendant's right to present exculpatory evidence outweighs any prejudice from impugning a victim's character. *See* Fed. R. Evid. 404(a)(2)(B).

Several circuits have held that reverse-404(b) evidence is admissible if "it tends, alone or with other evidence, to negate … guilt." *Stevens*, 935 F.2d at 1404; *see Agushi v. Duerr*, 196 F.3d 754, 760 (7th Cir. 1999); *Aboumoussallem*, 726 F.2d at 912. While reserve-404(b) evidence must still comply with Rule 403, the focus is not on prejudice but rather on "considerations such as undue waste of time and confusion of the issues." *Stevens*, 935 F.2d at 1404. And such considerations rarely outweigh the right to "a meaningful opportunity to present a complete defense." *Nevada v. Jackson*, 569 U.S. 505, 509 (2013); *see Murray*, 474 F.3d at 941 ("In the vast run of cases, the only serious objection to [reverse-404(b)] evidence is that its probative value is slight").

This Court has held that it is reversable error to exclude evidence of a victim's prior crimes when relevant to defend a murder charge. *See United States v. Burks*, 470 F.2d 432, 434-35 (D.C. Cir. 1972). *Burks* held that evidence that the alleged victim had, years earlier, killed a child was relevant to self-defense because it suggested "the defendant reasonably feared" the victim. *Id.* Courts have followed

*Burks* for generations. *See, e.g.*, *United States v. James*, 169 F.3d 1210, 1214-15 (9th Cir. 1999). Similarly, in a civil police shooting case, this Court admitted the plaintiff's prior arrests in order to "make less creditworthy [his] claim that he did not lunge for [an officer's] gun." *Lewis v. D.C.*, 793 F.2d 361, 363 (D.C. Cir. 1986); *White*, 29 N.E.3d at 942.

## B. Hylton-Brown's Criminal History and Gang Association Was Relevant to Show the Basis for the "Pursuit."

Sutton's prior knowledge[5] of Hylton-Brown was critical to understanding Sutton's state of mind when he evaluated Officer Pitt's report. To a lay juror, a report that Hylton-Brown had "an altercation with somebody" on the corner of Georgia & Kennedy means very little. Trial Tr. (11/29/22 PM), at 68:23-25 (Novick). As the prosecutor put it, "all you heard was that Hylton-Brown got into an argument earlier that day, a heated argument maybe." *Id.* (12/14/22 PM) at 72:21-23.

---

[5] There was sufficient foundation for this evidence, as the district court correctly found. Pretrial Hr'g (10/17/22) at 199:5-19. Foundation is a low bar: Sutton only needed to show that a reasonable juror ***could*** find by a preponderance that he was aware of Hylton-Brown's criminal history and gang associations. Fed. R. Evid. 104(b). Several officers testified that Sutton discussed Hylton-Brown's criminal and gang history with them, that they saw Sutton interact with Hylton-Brown many times, that Hylton-Brown was "well known" among CST, and that it was CST's job to know the criminal histories and gang associations of the Kennedy Street regulars, like Hylton-Brown. *See* SOC II-B. Officers further testified that Sutton regularly studied arrest reports about Kennedy Street regulars and exchanged intelligence with fellow officers. *See* SOC I.B-C. A reasonable juror could credit this testimony.

But the experienced CST officers heard something very different. They heard that a known gang-member and drug-dealer, with a history of gun-possession and violent crime, nearly got into a fight over money with another suspected gang member in an "open-air drug market." Indeed, the officer who witnessed the incident and who patrols Kennedy Street by mountain bike everyday, reported that, in her judgment, the altercation was indicative of KDY "infighting." The district court found that the word "infighting" is "fraught with gang-related … implications." Trial Tr. (11/28/22 PM) at 61:2-7. Agreed! That is why, having heard that word from Pitt, Sutton would have been reasonably concerned that gang-related violence was brewing. This is lightyears from what Pitt was allowed tell the jury: that she "ha[d] concerns about what [she] had seen based upon [her] experience." *Id.* at 62:10-13.

The district court nonetheless excluded all evidence of Hylton-Brown's criminal history and gang associations because "[w]hether Hylton-Brown's prior criminal conduct provided Sutton with additional reasonable suspicion to stop Hylton-Brown for anything more than a traffic violation is only minimally probative." Dkt. 530, at 30. This is wrong for at least five reasons.

**First,** that there was reasonable suspicion to suspect Hylton-Brown of crimes more serious than a traffic violation was relevant to Sutton's justification defense. *See supra* Section II.D.

**Second,** it was relevant to "the national standard of care" because reasonable suspicion that Hylton-Brown was involved in something "more than a traffic violation" increased "the urgency of making an immediate apprehension." *Walker*, 689 A.2d at 43.

**Third,** reasonable suspicion that Hylton-Brown was committing or about to commit a non-traffic crime was relevant to rebut the allegation that Sutton violated the General Order by "'pursuing a vehicle for the purpose of affecting a stop for a traffic violation.'" Indictment ¶ 8. The prosecution understood this. That is why it spent the entire trial attempting to prove that there was no basis to suspect Hylton-Brown of non-traffic crimes, *see* SOC III.C.2. And the district court, in upholding the verdict, stressed that "the government's evidence made clear that Hylton-Brown was not suspected of a violent crime or possessing a firearm; he was being stopped for a traffic violation, and pursued, at best, for failing to pull over." Dkt. 526, at 38-39; *see also id.* at 20. Yet, when excluding contrary defense evidence, all of a sudden whether there was "reasonable suspicion to stop Hylton-Brown for anything more than a traffic violation" is not a "fact of consequence." Dkt. 530, at 30.

**Fourth,** the prosecution opened the door for questions about Hylton-Brown's criminal history by, for instance, having Officers Tejera and Al-Shrawi testify that "they did not suspect that Hylton-Brown had committed a felony or violent crime" nor "have reason to believe that Sutton suspected" that. Dkt. 526, at 20. The defense

should have been able to cross-examine those officers by asking, for instance, whether they were aware of Hylton-Brown's prior arrests, or that he fled on two prior occasions while in possession of drugs and a gun.

Similarly, the court allowed the prosecution to ask Officer Novick: "nothing other than what Officer Pitt told you indicated [Hylton-Brown] was going to be involved in a crime that night, right?" but cut him off when he attempted to reference his "preexisting knowledge" of Hylton-Brown. And the prosecution was permitted to minimize Pitt's concerns about the altercation she witnessed, SOC III.C.2.

**Fifth,** that Sutton reasonably suspected Hylton-Brown of crimes beyond traffic violations was relevant to explain his actions and rebut the allegation that he acted with nefarious motives. Where "the propriety of the behavior of the police [is] in question," this Court has allowed the government to use "prejudicial" and otherwise "irrelevant" evidence to explain the police action. *See United States v. Lewis*, 701 F.2d 972, 974 (D.C. Cir. 1983). In *Lewis*, the defendant was stopped for a traffic violation, arrested on an outstanding assault warrant, and, when a vehicle search yielded a gun, charged with gun possession. This Court allowed the prosecution to admit evidence that the arrest had been for an assault warrant, not the traffic violation, because "[a]rresting and handcuffing a man" for a mere traffic violation "might seem, at the very least, like high-handed police behavior." *Id.* at 975. Therefore, "it was proper for the government to show that there was another

reason for the arrest" because "[o]therwise, the jury would have been left with the picture of a man who was arrested, handcuffed, and placed in a police cruiser … merely because he had run a caution light." *Id.*

So too here. Without knowing what Sutton knew about Hylton-Brown, Sutton's actions could certainly sound "unreasonably harsh." Because Sutton was not allowed to give the true explanation for this conduct, the jury likely "penalize[d]" him "by drawing a negative inference" about his true motivations. *Old Chief v. United States*, 519 U.S. 172, 187-88 (1997). Indeed, the prosecution encouraged precisely this inference, claiming that Hylton-Brown "could have sneezed at that corner, and [Sutton] still would have pursued him," and suggesting that Sutton believed he could "just chase people in certain parts of the city" simply "because they're out after 10:00 p.m." Trial Tr. (12/14/22 PM) at 79:19-25.

## C. The District Court Erroneously Excluded the $3128.

The court excluded the $3,128 in Hylton-Brown's possession on the grounds that "Hylton-Brown's motive to flee was not relevant." Dkt. 530, at 27-28; Dkt 382 at 7-10. But Hylton-Brown's motive was plainly relevant to rebut the prosecution's theory of proximate cause.

The prosecution alleged that Sutton "chased Hylton into the path of an oncoming car," Trial Tr. (10/25/22 AM), at 46:1-2, and "flushed [him] into Kennedy Street," id. (12/14/22 AM) at 19:13-15; 48:1-4. Hylton-Brown did not intentionally

drive into Kennedy Street, prosecution claimed, but rather "lost control … because he was being chased." *Id.* at 75:19-23. Sutton's theory was that Hylton-Brown chose to take a risky turn in order to avoid police.  The $3,128 explains why he might take that risk: to avoid losing money and providing the government with evidence of criminality. Conversely, the absence of any motive to put his own safety at risk supports the prosecution's theory.  That is presumably why the prosecution told the jury: "[w]e don't know why Hylton-Brown decided to drive his moped away from Sutton … We'll never know what the reason was. And … we maintain that he's actually not fleeing at all."  (12/14/22 PM) at 80:1-8. Where a suspect's bad acts provide a motive to flee, they are admissible to show the suspect did flee. *See Knight v. Miami-Dade Cty.*, 856 F.3d 795, 816-17 (11th Cir. 2017); *Mendoza v. Gates*, 19 F. App'x 514, 518-19 (9th Cir. 2001); *Bowden*, 600 F.2d at 284.

The $3128 in cash was also relevant to rebut the government's assertions that Hylton-Brown "wasn't doing a damn thing wrong." (12/14/22 PM) at 72:5-10. The prosecution was allowed to call one of Hylton-Brown's friends to testify that Hylton-Brown was not "engaging in any sort of illegal activity" that night. (11/16/22 AM) at 46-47 (Mason). If the prosecution can offer post hoc evidence of lack of criminality to show that the "pursuit" was unreasonable, the defense can offer post hoc evidence of criminality to show it was reasonable. *See Pagotto*, 762 A.2d at 110.

## V. The District Court Erred by Prohibiting Sutton from Presenting Testimony on the Standard of Care for Police Pursuits.

Sutton attempted to show, based on expert testimony and his own MPD training, the constitutional criminal procedure that police are taught. Dkt. 232, at 4-7; Dkt. 449, at 19. That training teaches, in short, that officers may use reasonable means to affect a seizure and that "reasonableness" is determined by balancing the risk against the law enforcement need. Dkt. 232, at 4-7; *supra* Section II.C. The district court excluded this testimony as inconsistent with its ruling that compliance with Fourth Amendment precedent is not a defense and as impermissible legal opinion. Dkt 530, at 23, 25; Dkt. 364, at 20, 22; *id.* at 30.

But Sutton's training on constitutional criminal procedure was relevant to "the standard of care applicable in this case." Dkt. 232, at 12; *see also id.* at 4. Indeed, even though violation of the General Order was not itself a crime, the prosecution was permitted to admit the General Order, and Sutton's training on it, to show the standard of care. So too, even if compliance with constitutional principles is not itself a defense, Sutton should have been able to admit his training on those principles as relevant to the standard of care. Admitting Sutton's training on *Graham* would have allowed him to argue to the jury that, while compliance with the General Order might be a factor, the ultimate standard of care involves a more flexible balancing of risks from the prospective of a reasonable officer.

## VI. The Obstruction Conviction Must Be Reversed.

### A. The Prosecution Did Not Show That Information About the Pursuit "Relat[ed] to the Commission or Possible Commission of a Federal Offense."

Section 1512(b)(3) makes it a crime to "prevent the communication to a [federal] law enforcement officer … of information relating to the commission or possible commission of a Federal offense." This means the information must relate to "conduct that could constitute a federal crime." *United States v. Bailey*, 405 F.3d 102, 109 (1st Cir. 2005).

Here, any possibility that the Hylton-Brown pursuit could have constituted a federal offense was foreclosed by *County of Sacramento v. Lewis*, 523 U.S. 833 (1998). *Lewis* held that "a police pursuit … does not amount to a 'seizure' within the meaning of the Fourth Amendment." *Id.* at 843. Thus, "no Fourth Amendment seizure would take place where a pursuing police car sought to stop the suspect only by the show of authority represented by flashing lights and continuing pursuit, but accidentally stopped the suspect by crashing into him." *Id.* at 844. Similarly, police do not violate "substantive due process by causing death through deliberate or reckless indifference to life in a high-speed automobile chase." *Id.* at 836. Rather, "in such circumstances only a purpose to cause harm unrelated to the legitimate object of arrest" will show "a due process violation." *Id.*

The prosecution did not even attempt to show that there was ever reason to believe that the Hylton-Brown pursuit violated the Fourth Amendment or Due Process. Rather, the "only evidence tending to establish [the possible federal crime] element was testimony" from the case agents that they "understood that the U.S. Attorney's Office was conducting a federal civil rights investigation." Dkt. 526, at 91. The district court found this evidence "not overwhelming" but "sufficient." *Id.*

This was error. Whether there was a "civil rights investigation" is irrelevant because Section 1512(b)(3) "does not depend on the existence or imminency of a federal ***investigation*** but rather on the possible existence of a federal ***crime***." *United States v. Guadalupe*, 402 F.3d 409, 411 (3d Cir. 2005) (emphasis added). The case agents never explained what federal crimes they were investigating or why they believed those crimes may have occurred. They just repeated that their "understanding"—based on what they were told by the AUSA—was that it was a "civil rights investigation." *See, e.g.*, Trial Tr. (10/26/22 PM) at 16:9-21; (11/7/22 PM) at 100:23-101:1; Dkt. 526, at 89-91.

Moreover, the mere fact that the U.S. Attorney may have a policy of receiving notifications of all police-involved deaths does not turn any statement about a police-involved death into "information relating to the commission or possible commission of a federal offense." Were it otherwise, the mere adoption of such a policy could create a federal nexus for § 1512(c) charges based on alleged obstructive conduct related

only to possible administrative violations or state crimes. *Cf. Fowler*, 563 U.S. at 675 (rejecting reading of § 1512 that "would bring within the scope of this statute many instances of witness tampering in purely state investigations and proceedings"). This would vastly expand federal criminal jurisdiction without a clear congressional mandate, in defiance of the Supreme Court's repeated admonitions. *See Fischer v. United States*, 144 S. Ct. 2176, 2189 (2024); *Jones* v. *United States*, 529 U. S. 848, 858 (2000).

### B. The District Court Erred By Refusing To Instruct the Jury on the Nature or Elements of the Possible Federal Offense.

Jury instructions must "provide the jury with sufficient understanding of the issues and applicable standards." *United States v. Wilson*, 605 F.3d 985, 1018 (D.C. Cir. 2010) (quotations omitted). So, for example, it is "well-established that a trial court errs in a conspiracy case if it fails to instruct the jury on an element of the crime that is the object of the conspiracy" because "if a jury is asked to determine whether a defendant conspired to commit an offense, the jury needs to know the elements of that offense." *United States v. Alghazouli*, 517 F.3d 1179, 1189 (9th Cir. 2008) (collecting cases); *see also United States v. Lake*, 472 F.3d 1247, 1263 (10th Cir. 2007) ("When a defendant's defense is so dependent on an understanding of an applicable law, the court has a duty to instruct the jury on that law.").

Sutton had a strong argument that the information he allegedly attempted to hide did not "relat[e] to the commission or possible commission of a Federal offense." 18

U.S.C. § 1512(b)(3). To make this argument, he requested the jury be instructed on the nature and elements of the "possible federal offense" at issue. Dkt. 403, at 4, 7. The district court's refusal made it impossible to argue that the obstruction charges did not relate to "a possible federal offense."

### C. The Prosecutor's Misleading and Uncorrected Statements Violated Due Process.

The prosecution filled this instructional void by repeatedly suggesting that Sutton was charged with attempting "to cover up this murder," Trial Tr. (10/25/22 AM) at 65:6-7, *see also id.* at 47:5-8, 20-21, 64:10-11, 65:6-13, thereby falsely implying that the charged second degree murder *was* the offense underlying the obstruction charges. Despite acknowledging that "the opening statement certainly made reference to obstruction of an investigation into a possible murder, a D.C. Code offense," Dkt. 515, at 17, the court refused a curative instruction that "murder in the second degree is not a federal offense." Dkt. 403, at 7. This is reversable error. See *United States v. Williams*, 836 F.3d 1, 15-16 (D.C. Cir. 2016).

### D. The District Court Erred by Precluding Sutton from Arguing that He Did Not Violate Hylton-Brown's Constitutional Rights.

The ruling that Sutton could not argue or "present[] evidence that his conduct did not violate Hylton-Brown's constitutional rights," Dkt. 530, at 38; Trial Tr. (12/14/22 AM) at 12:4-10, prejudiced Sutton's ability to defend the obstruction charges. The federal offense to which Sutton's statements allegedly related was

presumably a violation of Hylton-Brown's constitutional rights under 18 U.S.C. § 242. Thus, in order to show his statements did not relate to that alleged federal offense, Sutton was entitled to argue that he did not violate Hylton-Brown's constitutional rights.

Nor can this ruling be justified on the grounds that the prosecution only had to show a "possible" rather than an actual violation of Hylton-Brown's constitutional rights because the prosecution chose to allege that Sutton hindered information "relating to the commission **_and_** possible commission of a federal offense," Indictment at § ¶ 50 (emphasis added), and continued to argue in closing that Sutton obstructed the investigation into actual—not possible—crimes. Trial Tr. (12/14/22 AM) at 47:17-48:25. Regardless, that the pursuit did not constitute a federal offense is obviously relevant to whether it constituted a possible federal offense.

## **Conclusion**

The pending motion to vacate should be granted or, in the alternative, the

judgement should be reversed or vacated for the reasons stated above.

Respectfully submitted,

Date: January 27, 2025                  ALSTON & BIRD LLP

/s/ Kellen S. Dwyer
Kellen S. Dwyer
Alston & Bird LLP
950 F Street, NW
Washington, DC 20004-1404
Ph: 202/239-3300
Fax: 202/239-3333
kellen.dwyer@alston.com

J. Michael Hannon, #352526
2101 L Street, NW Suite 300
Washington, DC 20037
Tel: (202) 232-1907
Fax: (202) 232-3704
jhannon@hannonlawgroup.com

Carmen D. Hernandez
7166 Mink Hollow Rd
Highland, MD 20777
(240) 472-3391
Chernan7@aol.com

## CERTIFICATE OF SERVICE

I also certify that on January 27, 2025, I filed electronically the foregoing with the Clerk of the Court using the CM/ECF system, which will send notice of the filing to all counsel of record.

/s/ Kellen S. Dwyer
Kellen Dwyer
950 F Street, NW
Washington, DC 20004-1404
Phone: (202) 239-3300
Kellen.Dwyer@alston.com

*Counsel for Officer Terence Sutton*

## CERTIFICATE OF COMPLIANCE

I certify that this brief, minus excluded portions, contained 14,997 words, in compliance with the Court's order dated January 10, 2025 extending the word limit to 15,000.

/s/ Kellen S. Dwyer
Kellen Dwyer
950 F Street, NW
Washington, DC 20004-1404
Phone: (202) 239-3300
Kellen.Dwyer@alston.com

*Counsel for Officer Terence Sutton*

## Statutory Appendix

## Table of Contents

18 U.S.C. § 242 ...................................................................................................1

18 U.S.C. § 1512(b)(3)........................................................................................1

D.C. Code § 5–127.04(a) ...................................................................................2

D.C. Code § 22-2103 ..........................................................................................2

D.C. Code § 23–581(a)(1) ..................................................................................2

D.C. Code § 50-2201.05b(b)…………………………………………………...........2

## 18 U.S.C. § 242

Whoever, under color of any law, statute, ordinance, regulation, or custom, willfully subjects any person in any State, Territory, Commonwealth, Possession, or District to the deprivation of any rights, privileges, or immunities secured or protected by the Constitution or laws of the United States, or to different punishments, pains, or penalties, on account of such person being an alien, or by reason of his color, or race, than are prescribed for the punishment of citizens, shall be fined under this title or imprisoned not more than one year, or both; and if bodily injury results from the acts committed in violation of this section or if such acts include the use, attempted use, or threatened use of a dangerous weapon, explosives, or fire, shall be fined under this title or imprisoned not more than ten years, or both; and if death results from the acts committed in violation of this section or if such acts include kidnapping or an attempt to kidnap, aggravated sexual abuse, or an attempt to commit aggravated sexual abuse, or an attempt to kill, shall be fined under this title, or imprisoned for any term of years or for life, or both, or may be sentenced to death.

## 18 U.S.C. § 1512

(b)Whoever knowingly uses intimidation, threatens, or corruptly persuades another person, or attempts to do so, or engages in misleading conduct toward another person, with intent to—

…

(3) hinder, delay, or prevent the communication to a law enforcement officer or judge of the United States of information relating to the commission or possible commission of a Federal offense or a violation of conditions of probation supervised release, parole, or release pending judicial proceedings;

shall be fined under this title or imprisoned not more than 20 years, or both.

### D.C. Code § 5–127.04(a)

(a) The Mayor of the District of Columbia, and the members of the police force, shall possess in every part of the District all the common-law powers of constables, except for the service of civil process and for the collection of strictly private debts, in which designation fines imposed for the breach of the ordinances in force in the District shall not be included.

### D.C. Code § 22-2103

Whoever with malice aforethought, except as provided in §§ 22-2101, 22-2102, kills another, is guilty of murder in the second degree.

### D.C. Code § 23–581(a)(1)

(a)(1) A law enforcement officer may arrest, without a warrant having previously been issued therefor …

(B) a person who he has probable cause to believe has committed or is committing an offense in his presence;

### D.C. Code § 50-2201.05b(b)(1)

(b)(1) An operator of a motor vehicle who knowingly fails or refuses to bring the motor vehicle to an immediate stop, or who flees or attempts to elude a law enforcement officer, following a law enforcement officer's signal to bring the motor vehicle to a stop, shall be fined not more than not more than the amount set forth in § 22-3571.01, or imprisoned for not more than 180 days, or both.

(2) An operator of a motor vehicle who violates paragraph (1) of this subsection and while doing so drives the motor vehicle in a manner that would constitute reckless driving under § 50-2201.04(b), or causes property damage or bodily injury, shall be fined not more than not more than the amount set forth in § 22-3571.01, or imprisoned for not more than 5 years, or both.